**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**Keri L. Borzilleri**

        Plaintiff,

    v.

**Marilyn J. Mosby, in her personal capacity**

        Defendant.

Case No. 15 Civ. 3760 (JFM)

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT .........................................................................................................................7

I.   Ms. Borzilleri Has Stated A Claim For Violation Of Her First Amendment Right To Free Expression On A Matter Of Public Concern. ...........................................................7

   A.   Ms. Borzilleri Spoke As A Citizen On A Matter Of Public Concern. ...........................9

   B.   The Balance Of Equities Favors Ms. Borzilleri's Speech Rights In This Case. ...........11

      i.   *Ms. Borzilleri And The Public At Large Have Substantial Interests In Ms. Borzilleri's Political Expression Related To The State's Attorney Election.* ...............................11

      ii.   *Ms. Mosby Can Identify No Valid Government Interest In Suppressing Ms. Borzilleri's Speech.* ...................................................................................................12

      iii.   *Accepting Ms. Mosby's Position In This Case Would Eradicate Public Employees' First Amendment Right To Free Political Expression.* ...............................................16

   C.   The Complaint Plausibly Alleges That Ms. Borzilleri Was Terminated In Retaliation For Her Political Expression ..........................................................................................18

   D.   Ms. Borzilleri's Speech Claim Is Independent From Her Association Claim. .............19

   E.   Ms. Mosby Is Not Entitled To Qualified Immunity From The Free Speech Claim. ......21

II.   Ms. Borzilleri Has Stated A Claim For Violation Of Her Free Speech Rights Under Article 40 Of The Maryland Constitution. ......................................................................23

III.   Ms. Borzilleri Has Properly Stated A Claim For Patronage Dismissal In Violation Of Her First Amendment Right To Free Association. ....................................................24

   A.   Ms. Borzilleri Was Fired For Supporting Ms. Mosby's Political Rival. ......................26

   B.   Ms. Mosby's Conduct Is Unlawful Under The *Elrod-Branti* Standard. .......................26

      i.   *The Elrod-Branti Standard And The Jenkins Test Are Fact- And Context-Specific.* ..26

      ii.   *Ms. Borzilleri's Position As A Career Prosecutor Did Not Relate To Partisan Political Interests.* ...............................................................................................................27

      iii.   *Ms. Borzilleri Never Held A Confidential Or Policymaking Position.* .....................28

   C.   *Jenkins Was Limited To North Carolina Deputy Sheriffs* .............................................29

   D.   The Court Is Not Required To Determine Whether The Assistant State's Attorney Position Requires Partisan Affiliation At The Motion To Dismiss Stage ...........................31

E.   The Breadth Of Mosby's Position Has Wide-Ranging, Negative Implications For Attorney Public Servants. .................................................................................32

F.   Ms. Mosby is Not Entitled to Qualified Immunity From the Patronage Claim. ............33

IV.   The Amended Complaint States A Common Law Claim For Abusive Discharge. ..........34

A.   Terminating Non-Supervisory Public Employees For Political Reasons Contravenes The Public Policy That Protects Maryland Employees' Right To Participate In Political Activities And Express Political Opinions. ..................................................................34

B.   Statutory Immunity Cannot Shield Ms. Mosby's Unlawful Actions. ...........................35

i.   *The Facts Support An Inference That Ms. Mosby Acted With Actual Malice.* ............36

ii.   *The Facts Alleged Also Support An Inference That Ms. Mosby's Decision To Fire Ms. Borzilleri Was Grossly Negligent.* ..................................................................39

CONCLUSION ...................................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Akers v. Caperton*,
    998 F.2d 220 (4th Cir. 1993)… ......................................................................29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................8, 9, 13

*Barbre v. Pope*,
    935 A.2d 699 (Md. 2007) ...............................................................36, 40

*Behan v. Gagliano*,
    581 A.2d 854, 856 (Md. 1999)…………………………………………………..36

*Billingslea v. Astrue*,
    502 F. App'x 300 (4th Cir. 2012) ...................................................................23

*Bland v. Roberts*,
    730 F. 3d 368 (4th Cir. 2013) ...................................................................21

*Branti v. Finkel*,
    445 U.S. at 519 ...............................................................................*passim*

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ...........................................................................11

*Burson v. Freeman*,
    504 U.S. 191 (1992) ...................................................................7, 8, 9

*Connick v. Myers*,
    461 U.S. 138 (1983) ...........................................................................20

*Cooper v. Lee Cnty Bd. of Supervisors*,
    188 F.3d 501 (1999) ...........................................................................31

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ...........................................................................22

*Elrod v. Burns*,
    427 U.S. 347 (1976) ...............................................................................*passim*

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ...................................................................10, 20

*Garnier v. Rodriguez*,
    506 F.3d 22 (1st Cir. 2007) ...........................................................................33

*Garrison v. Louisiana*,
    379 U. S. 64 (1964) ...........................................................................11

*Jakanna Woodworks, Inc. v. Montgomery County*,
    689 A.2d 65 (Md. 1997). ...........................................................................23

*Jenkins v. Medford*,
    119 F.3d 1156 (4th Cir. 1997) ...............................................................*passim*

*Jones v. Dodson*,
  727 F.2d 1329 (4th Cir. 1984) ........................................................................20

*Joyner v. Lancaster*,
  815 F.2d 20 (4th Cir. 1987) ...........................................................................21

*Kenney v. Charnock*,
  441 F. Supp. 769 (S.D.W. Va. 2006) *aff'd* 221 F. App'x 289 (4th Cir. 2007).............32, 34

*Kirby v. City of Elizabeth City*,
  388 F.3d 440 (4th Cir. 2004) ...........................................................................9

*Knight v. Vernon*,
  214 F. 3d 544 (4th Cir. 2000) ....................................................................22, 29

*Lane v. Franks*,
  134 S. Ct. 2369 (2014) .........................................................................*passim*

*McVey v. Stacy*,
  157 F.3d 271 (4th Cir. 1998) ..................................................................*passim*

*Mills v. Alabama*,
  384 U.S. 214 (1966) ......................................................................................17

*Mitcheson v. Harris*,
  955 F. 2d 235 (4th Cir. 1992) ........................................................................23

*Monitor Patriot Co. v. Roy*,
  401 U.S. 265 (1971) ......................................................................................11

*Nader v. Blair*,
  549 F.3d 953 (4th Cir. 2008) .........................................................................26

*Newell v. Runnels*,
  967 A.2d 729 (Md. 2009) ......................................................................*passim*

*O'Hare Truck Service, Inc. v. City of Northlake*,
  518 U.S. 712 (1996) ........................................................................20, 25, 26

*O'Leary v. Shipley*,
  545 A.2d 17 (Md. 1988) ................................................................................24

*Okwa v. Harper*,
  757 A.2d 118  (Md. 2000) .............................................................................36

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ......................................................................................22

*Pickering v. Board of Education*,
  391 U.S. 563 (1968). ............................................................................*passim*

*R.E. Linder Steel Erection Co., Inc. v. Wedemeyer, Cernik, Corrubia, Inc.*,
  585 F. Supp. 1530 (D. Md. 1984) ..................................................................36

*Ridpath v. Board of Governors Marshall Univ.*,
  447 F.3d 292 (4th Cir. 2006) ....................................................................14, 17

*Rini v. Zwirn*,
886 F. Supp. 270 (E.D.N.Y. 1995)........................................................32

*Roth v. United States*,
354 U.S. 476 (1957) ...........................................................................8

*Sales v. Grant*,
158 F.3d 768 (4th Cir. 1998) ............................................................31

*San Diego v. Roe*,
543 U.S. 77 (2004) ...........................................................................12

*Schenck v. Pro-Choice Network of Western NY*,
519 U.S. 357 (1997) .........................................................................22

*Shoemaker v. Smith*,
725 A.2d 549 (1999) .........................................................................40

*Siegert v. Gilley*,
500 U.S. 226 (1991) .........................................................................22

*Smith v. Frye*,
488 F.3d 263 (4th Cir. 2007) .....................................................20, 25

*Suarez Corp. Indus. v. McGraw*,
202 F.3d 676 (4th Cir. 2000) ..............................................................8

*TSC Industries v. Northway, Inc.*,
426 U.S. 438 (1976)..........................................................................32

**STATUTES, RULES AND REGULATIONS**

5 U.S.C. § 2302.......................................................................................33

Md. Code, Cts. & Jud. Proc., § 5-522. ....................................................36

Md. Code, Local Government, § 1-303 to 304........................................35

Md. Code, State Personnel and Pensions Article, § 2–304 ............ 12, 16, 35

U.S. Const. Amend. I ...................................................................*passim*

**OTHER AUTHORITIES**

Justin Fenton, *Marilyn Mosby says prosecutors can be fired for not showing political support*,
The Baltimore Sun, (Jan. 21, 2016), http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-mosby-lawsuit-response-20160121-story.html. ...............................................17

# INTRODUCTION

This case concerns whether career prosecutors must relinquish their rights, under the First Amendment and state law, as a condition of their employment. Although Ms. Mosby has attempted to refine her arguments in her motion to dismiss the Amended Complaint,[1] her position remains unchanged.  She takes the view that all the career prosecutors in the Baltimore City State's Attorney's Office are her "alter egos" and therefore have no right to express themselves freely or affiliate with the political candidates or causes of their choosing. In her first days as State's Attorney, Ms. Mosby made abundantly clear her desire to retaliate against those career employees, such as Plaintiff Keri Borzilleri, who voiced support for Ms. Mosby's political opponent in the Democratic Primary election campaign.  Even a single expression of support for, or act of affiliation with, her disfavored political candidate or cause could be grounds for termination.

Ms. Mosby's position, however, conflicts with principles that have ancient roots in our legal system.  The free speech clause of the First Amendment guarantees public employees' right to speak freely outside the workplace on matters of public concern, so long as that speech does not impair the efficient and effective delivery of government services.  *Pickering v. Board of Education*, 391 U.S. 563 (1968). The First Amendment's free association clause protects career government employees in non-political positions from being terminated on the basis of their political affiliations.  *Elrod v. Burns*, 427 U.S. 347 (1976).  Maryland law affords these employees the same protections as the First Amendment, under Article 40 of the Declaration of Rights, but also grants them a near absolute statutory right to express their political opinions and

---

[1] Citations to "Compl." refer to the Amended Complaint, Dkt. 13, filed on February 8, 2016 in this action.

a common law cause of action for abusive discharge to vindicate that right. *Newell v. Runnels*, 967 A.2d 729, 765 (Md. 2009). Both federal and Maryland law recognize that career public employees do not abandon their rights to speak and engage in the political process when they enter government service.

Granting Ms. Mosby's motion to dismiss would disregard these established legal protections and subject all career government employees who implement the policies of an elected official to the types of speech retaliation and patronage politics that the First Amendment and Maryland law were designed to prevent. For these reasons, further explained below, Ms. Mosby's motion should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiff Keri Borzilleri is an experienced career prosecutor who served with distinction in the Baltimore City State's Attorney's Office ("State's Attorney's Office" or "Office") for nearly a decade under two different elected State's Attorneys. Compl. ¶ 1. During her tenure as an Assistant State's Attorney, Ms. Borzilleri prosecuted hundreds of criminal cases on behalf of the people and City of Baltimore, including dozens of jury trials. *Id.* On the strength of her reputation as a dedicated and skillful public servant, including uniformly exceptional performance reviews, Ms. Borzilleri was tasked with prosecuting some of Baltimore City's most serious crimes, including over fifty attempted murder cases and more than twenty non-fatal shootings. *Id.* ¶ 5-6.

Although the characteristics of her caseload may have changed over time, Ms. Borzilleri at all times remained a line prosecutor—with no supervisory responsibilities over other attorneys and with no input or control over Office policies. *Id.* ¶ 8. Ms. Borzilleri regularly consulted with her supervisors regarding the day-to-day management of her cases, such as charging decisions

and plea offers. *Id.* At no point were Ms. Borzilleri's personal partisan political beliefs relevant to the manner in which she carried out her job responsibilities.

Ms. Borzilleri and Ms. Mosby were both originally hired in 2005 by then-State's Attorney Patricia Jessamy. *Id.* ¶ 1. They worked with one another as junior-level prosecutors and always maintained a professional and cordial relationship built on mutual respect. *Id.* ¶¶ 9-10. After Gregg Bernstein defeated Ms. Jessamy in the 2010 Democratic Primary election, both Ms. Borzilleri and Ms. Mosby stayed on as line prosecutors following the transition to Mr. Bernstein's leadership. *Id.* ¶ 11. Ms. Mosby vocally supported Ms. Jessamy during the election campaign, including by hosting a "meet and greet" campaign event at Ms. Mosby's house. Mr. Bernstein retained Ms. Mosby, as he did all other line prosecutors without regard to whether they had supported his political opponent's re-election campaign. *Id.* Ms. Mosby continued to serve as an Assistant State's Attorney under Mr. Bernstein's leadership for nearly a year, until she left voluntarily to work at an insurance company. *Id.* ¶¶ 11-12. The State's Attorney's Office experienced no detrimental effects from Mr. Bernstein's retention of Ms. Jessamy's former supporters—who continued to fulfill their job responsibilities with the professionalism expected of career prosecutors. *Id.* ¶ 25.

In the next State's Attorney election campaign in 2014, Ms. Borzilleri chose to support her boss Mr. Bernstein in his bid for re-election against a challenge in the Democratic Primary from Ms. Mosby. *Id.* ¶ 13. Ms. Borzilleri made this choice independently, unprompted by any request or expectation from Mr. Bernstein. *Id.* She expressed her support for Mr. Bernstein in various ways, including by hosting a campaign "meet and greet" event at her home attended by around twenty people, including Mr. Bernstein. *Id.* ¶ 14. At the event, Ms. Borzilleri introduced Mr. Bernstein and told other attendees that she decided to support his re-election bid because she

thought that he had performed effectively as State's Attorney and, consequently, had helped improve the City of Baltimore. *Id.* She also expressed this view in electronic leaflets she distributed to publicize the event, in personal conversations with prospective voters at another campaign event she attended, and by placing a Bernstein campaign sign in the front of her home, visible to the public. *See id.* ¶¶ 14, 17 & Ex. A. Ms. Mosby learned about Ms. Borzilleri's campaign activities and support for Mr. Bernstein, among other ways, through Janice Bledsoe—who viewed photos of the event on Ms. Borzilleri's Facebook page, and who Ms. Mosby later appointed to be one of her political deputies. *Id.* ¶¶ 15, 63.

Even during the primary campaign, Ms. Mosby made clear her plans to retaliate against those who expressed support for Mr. Bernstein. For example, at a professional affinity banquet, Ms. Mosby stared at a career Assistant State's Attorney sitting next to Mr. Bernstein ("Attorney B") from across the room while moving her hand slowly across her throat in a slashing motion. *Id.* ¶ 32. Several attendees at the banquet witnessed Ms. Mosby's threatening gesture, and news of the gesture spread widely, causing several of Attorney B's colleagues at the State's Attorney's Office to remark that Ms. Mosby planned to fire Attorney B if she won the election. *Id.* Similarly, at community meetings attended by Ms. Borzilleri in her capacity as an Assistant State's Attorney, Ms. Mosby twice glared at her across the room, but declined to personally acknowledge or greet her. *Id.* ¶ 18.

In an upset, Ms. Mosby defeated Mr. Bernstein in the Democratic Primary and, facing no opposition from a Republican candidate, won the general election. *Id.* ¶¶ 19, 21. Despite her support for the losing candidate, Ms. Borzilleri had every expectation that she would continue to serve as a line prosecutor under Ms. Mosby's leadership—as Ms. Mosby herself had done following Ms. Jessamy's defeat in 2010. On January 6, 2015, the day after Ms. Mosby was

sworn into office, Joshua Rosenblatt, one of Ms. Mosby's newly-appointed political deputies, approached Ms. Borzilleri and asked her to join a new intelligence unit that he would lead in the State's Attorney's Office. *Id.* ¶ 23. Ms. Borzilleri "expressed enthusiasm for the position"— signaling clearly that she was ready and willing to continue serving as a line prosecutor under Ms. Mosby. *Id.*

Nevertheless, two days later at Ms. Mosby's formal investiture, Mr. Rosenblatt took Ms. Borzilleri aside, stated he had "information" that someone he wanted to recruit for the intelligence unit had campaigned for Mr. Bernstein, and "insisted that she describe any connection she had to the Bernstein campaign so that he could figure out 'how to fix the problem' before it became 'an issue.'" *Id.* ¶ 24. Ms. Borzilleri gave an honest account of her campaign activities for Mr. Bernstein. *Id.*

The following day, Ms. Borzilleri was summoned to a meeting with Steward Beckham, whom Ms. Mosby had appointed as her Chief of Administration. *Id.* ¶ 26. Mr. Rosenblatt escorted Ms. Borzilleri to the meeting and "confirmed that the meeting related to their conversation the day before about her support for Mr. Bernstein's campaign." *Id.* Without any explanation, Mr. Beckham informed Ms. Borzilleri that she was being terminated—effective immediately. *Id.* He later gave her a letter stating that she had been terminated, "without cause." *Id.* ¶ 27. An armed officer, who was a member of Ms. Mosby's personal security detail, then escorted a visibly upset Ms. Borzilleri past her colleagues, stood in her office as she collected her belongings, and walked her out of the building. *Id.*[2]

---

[2] Ms. Mosby initially characterized Ms. Borzilleri's termination in such a way as to deny Ms. Borzilleri her pension. *See* Compl. ¶¶ 53, 55. After Ms. Borzilleri served the State of

Ms. Borzilleri was one of many employees, including several career prosecutors, whom Ms. Mosby terminated in retaliation for their support for Mr. Bernstein's campaign. For example, Ms. Mosby fired an attorney who gave a statement to the media in support of Mr. Bernstein's candidacy; she also fired Mr. Bernstein's ex-wife, who had been his vocal supporter. *Id.* ¶¶ 31, 36. Ms. Mosby attempted to terminate yet another attorney, Attorney B, in the middle of a felony trial even though that attorney had already submitted a notice of resignation, effective two weeks thereafter. *Id.* ¶¶ 34-35. While Attorney B's supervisor convinced Ms. Mosby to delay terminating Attorney B because it would compromise the Office's ability to prevail in the pending trial, Ms. Mosby nevertheless directed her armed personal security detail to wait in Attorney B's office upon Attorney B's return from trial. *Id.* ¶ 35. Attorney B never returned to the Office. *Id.* Ms. Mosby eventually discontinued plans to terminate additional supporters of Mr. Bernstein based on the advice of her political and legal advisors and only after the initial wave of firings generated negative publicity in major news outlets. *Id.* ¶ 37.

Ms. Mosby's termination of Ms. Borzilleri and other veteran prosecutors immediately upon assuming office, and with no prior notice, substantially damaged the efficient and effective functioning of the State's Attorney's Office. The abrupt terminations required the reassignment of more than 250 pending cases, many of which involved violent crimes, to prosecutors without adequate expertise and case-specific knowledge. *Id.* ¶ 38. As a result, the Office had no choice but to drop charges against many of these defendants or agree to plea bargains with "incredibly

Maryland with a notice of claim setting forth the claims described in the Complaint, however, Ms. Mosby *sua sponte* reversed her position and characterized the termination as one that preserved Ms. Borzilleri's pension rights. *Id.* ¶¶ 59-60.

low" sentences. *Id.* ¶ 44 (quoting an independent commentator). This has directly contributed to Baltimore's rise in crime: at least five individuals accused of murder were released in cases under Ms. Mosby. *Id.*; *see also id.* ¶ 39 (defendant who had charges dismissed because the prosecutor handling the case was terminated later committed a violent and dangerous crime); *id.* ¶ 40 (defendant accused of a violent crime won acquittal after the prosecutor on the case was fired during a lunch break at trial); *id.* ¶ 41 (defendant against whom arson threat charges were dropped after Ms. Borzilleri was terminated was later murdered in West Baltimore).

Beyond the immediate repercussions associated with damaging the State's Attorney's Office's ability to prosecute these discrete cases, Ms. Mosby's actions have had such a negative effect on morale that fully 20% of the Office's prosecutors voluntarily left during her first year in office. *Id.* ¶ 43 (more than 30 of 127 prosecutors departed voluntarily in 2015). These mass departures have strained the State's Attorney's Office's capacity at the same time that crime in Baltimore has soared to record levels. *Id.* ¶ 46. Yet Assistant State's Attorney positions have remained vacant for months even while Ms. Mosby has expanded her public relations staff. *Id.*

## ARGUMENT

**I.     Ms. Borzilleri Has Stated A Claim For Violation Of Her First Amendment Right To Free Expression On A Matter Of Public Concern.**

The First Amendment to the U.S. Constitution protects "the freedom of speech." U.S. Const. amend. I. Political expression relating to candidates for public office is at "the core" of the speech rights protected by the First Amendment. *Elrod v. Burns*, 427 U.S. 347, 356 (1976). "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Burson v. Freeman*, 504 U.S. 191, 217 (1992). Accordingly, "[t]he First Amendment affords the broadest protection

to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Id.* (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

Like all citizens, "public employees do not renounce their citizenship when they accept employment, and [the Supreme] Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014). In particular, it is well-established that the First Amendment safeguards a public employee's "right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

For nearly half a century, the right of government employees to express their political views free from retaliation has been governed by the framework established by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968). Under *Pickering*, a public employee states a claim for First Amendment retaliation if she plausibly alleges that (1) she "was speaking as a citizen upon a matter of public concern," rather than "as an employee about a matter of personal interest"; (2) "the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public"; and (3) "the employee's speech was a substantial factor in the employee's termination decision." *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998).

The Complaint plainly sets forth facts that render it plausible that each of these elements is met here. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (internal quotation marks omitted). Unquestionably, speech related to the relative qualifications of candidates for public office is on "a matter of public concern." It is

undisputed that Ms. Borzilleri's spoke "as a citizen" when she expressed support for Mr. Bernstein's candidacy for State's Attorney, and not in her capacity as an Assistant State's Attorney. With respect to causation, Ms. Mosby concedes the Complaint alleges that "the sole reason" for Ms. Borzilleri's termination was her expressions of support for Ms. Mosby's political opponent. Def. Br.[3] at 1-2 (quoting Compl. at 2).

The only matter in dispute therefore relates to the balance of interests between Ms. Borzilleri's speech rights and Ms. Mosby's desire to suppress that speech—so-called *Pickering* balancing. The Complaint provides an ample factual basis to support a "reasonable inference" that the balance of interests favors Ms. Borzilleri's speech. *Ashcroft*, 556 U.S. at 678. It is well-established that free political expression deserves "the broadest protection." *Burson*, 504 U.S. at 217. This is especially true here, given Ms. Borzilleri's long record of service to the City of Baltimore and her special insight into the functioning of the State's Attorney's Office. The Complaint plausibly alleges that Ms. Borzilleri's speech had no negative consequences on the effective and efficient provision of public services. Instead, the Complaint documents the many negative effects that Ms. Mosby's abrupt termination of career prosecutors had on the Office's ability to carry out its mission. Accordingly, Ms. Mosby's actions not only suppressed the exercise of a fundamental constitutional right and sought to deprive the public of valuable speech, but also undermined the effective operation of the State's Attorney's Office.

A. Ms. Borzilleri Spoke As A Citizen On A Matter Of Public Concern.

Ms. Mosby does not contest that Ms. Borzilleri's speech in support of Gregg Bernstein's

---

[3] All citations to "Def. Br." refer to the "Defendant's Memorandum in support of Motion to Dismiss," Dkt. 15, filed on February 22, 2016 in this action.

campaign was on a matter of public concern. Def. Br. 15-18. Nor could she. *See Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) ("Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community."). The Complaint alleges that Ms. Borzilleri engaged in various forms of political expression related to the State's Attorney election. Compl. ¶¶ 14, 16, 17. In particular, Ms. Borzilleri hosted a campaign "meet and greet" event in her home attended by approximately twenty people, including Mr. Bernstein. *Id.* ¶ 14. She also distributed leaflets publicizing the event, which described Mr. Bernstein's accomplishments during his first term as State's Attorney. *Id.* At the event, Ms. Borzilleri introduced Mr. Bernstein to the gathered attendees, and publicly spoke on his behalf. *Id.* In addition, Ms. Borzilleri spoke personally to prospective voters at another campaign event in support of Mr. Bernstein's campaign and placed a campaign sign in the front of her home. *Id.* ¶¶ 16, 17.

In all of these circumstances, Ms. Borzilleri spoke as a citizen. The relevant inquiry here is whether the speech in question was made "pursuant to [the public employee's] official duties," *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006), or was made "outside the scope of [her] ordinary job responsibilities," *Lane*, 134 S. Ct. at 2378.[4] Here, Ms. Borzilleri spoke as a citizen because her expressions of support for Mr. Bernstein's campaign were made "outside the scope of [her]

---

[4] In *Garcetti*, the Supreme Court held that a memo written by a prosecutor and submitted to his supervisor "that addressed the proper disposition of a pending criminal case" did not qualify as speech "as a citizen" because the prosecutor "wrote his disposition memo because that is part of what he . . . was employed to do." 547 U.S. at 421-22. In *Lane*, by contrast, the Supreme Court held that a public employee's sworn testimony at a trial was speech "as a citizen," even though he "learned of the subject matter of his testimony in the course of his employment" for the government. 134 S. Ct. at 2379. In so holding, the Court made clear that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* .

ordinary job responsibilities." As the Complaint makes clear, Ms. Borzilleri's job responsibilities did not include making election-related communications or campaign-related tasks. Compl. ¶¶ 5, 18. Nor was political support an informal expectation or requirement: Mr. Bernstein never asked for Ms. Borzilleri's political support, and—at least until Ms. Mosby entered office—career staff like Ms. Borzilleri were not expected to engage in political expression in support of the sitting State's Attorney. *Id.* ¶¶ 13, 69. In addition, all of Ms. Borzilleri's political expression "took place outside of her workplace." Compl. ¶ 69.

B. The Balance Of Equities Favors Ms. Borzilleri's Speech Rights In This Case.

    i. *Ms. Borzilleri And The Public At Large Have Substantial Interests In Ms. Borzilleri's Political Expression Related To The State's Attorney Election.*

Ms. Borzilleri's interest in expressing her views on the candidates for State's Attorney is of the highest order. No First Amendment value is more precious than the right to express oneself freely regarding candidates for public office. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) ("it can hardly be doubted that the [First Amendment] guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office"); *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) ("The First Amendment affords the broadest protection to . . . political expression" related to "debate on the qualifications of candidates"). The primacy of this First Amendment interest reflects not only the sanctity of individual political belief and related expression, but also the fact that uninhibited political speech is the foundational building block for our system of government: "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley*, 424 U.S. at 14-15; *see also Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("speech concerning

public affairs is more than self-expression; it is the essence of self-government.").  Accordingly, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it."  *San Diego v. Roe*, 543 U.S. 77, 82 (2004).

Even within the universe of political expression, there is no topic on which Ms. Borzilleri personally has a greater speech interest than the State's Attorney election.  Ms. Borzilleri has lived and worked in Baltimore her entire adult life, and until her termination had spent her entire legal career as an Assistant State's Attorney.  Compl. ¶ 5.  Ms. Borzilleri's longstanding service to the City of Baltimore as a line prosecutor rendered her voice especially valuable to the public discussion over the State's Attorney election.  As the Supreme Court has repeatedly recognized, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment."  *Lane*, 134 S. Ct. at 2379.  "Accordingly, it is essential that [public employees] be able to speak out freely . . . without fear of retaliatory dismissal" on matters relating to their public employment.  *Pickering*, 391 U.S. at 572; *Lane*, 134 S. Ct. at 2377 ("There is considerable value . . . in encouraging, rather than inhibiting, speech by public employees" because "government employees are often in the best position to know what ails the agencies for which they work.").

  ii. *Ms. Mosby Can Identify No Valid Government Interest In Suppressing Ms. Borzilleri's Speech.*

Given the vitally important nature of the speech interest here, only an especially strong government interest could tip the *Pickering* balancing analysis in Ms. Mosby's favor.  *See Lane*, 134 S. Ct. at 2381 ("[A] stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern.").  No such interest is

evident from the face of the Complaint. *Ashcroft*, 129 S. Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

As an initial matter, Maryland has enacted legislation "granting public employees a near absolute right to 'participate in any political activity and express any political opinion.'" *Newell v. Runnels*, 967 A.2d 729, 765 (Md. 2009) (quoting Md. Code, State Personnel and Pensions Article, § 2–304). Any government interest asserted by Ms. Mosby in this litigation in suppressing Ms. Borzilleri's speech therefore conflicts with duly enacted Maryland law describing Maryland's interest in protecting the right of its employees to engage freely in political expression.

Further, nothing in the Complaint supports a reasonable inference that Ms. Mosby had any valid interest in terminating experienced, career prosecutors who had expressed support for her political opponent's campaign. Indeed, the Complaint plausibly alleges that Ms. Mosby knew, based on her personal experience, that retaining prosecutors who had supported an outgoing State's Attorney's campaign does not generally interfere with the ability of those prosecutors to perform their job responsibilities or have any other negative effect on the Office's functioning. Compl. ¶ 25. Specifically, during the 2010 transition to Mr. Bernstein's leadership following his election victory over the then-incumbent State's Attorney Patricia Jessamy, career prosecutors retained their positions without regard to which candidate they supported in the election. *Id.* ¶ 11. The continued employment of line prosecutors who had supported Ms. Jessamy's re-election campaign—including Ms. Mosby herself—had no negative effect on the efficient and effective operation of the State's Attorney's Office under Mr. Bernstein. *Id.*

Ms. Mosby's retaliatory termination of Ms. Borzilleri and other career prosecutors could

not possibly have been based on any observed negative effects on the Office. Ms. Mosby terminated Ms. Borzilleri the day after being formally sworn into office, *id.* ¶¶ 24-26, giving her no time to assess whether Ms. Borzilleri's presence impaired the Office's functioning. Moreover, Ms. Mosby made her decision despite knowing that one of her newly selected political appointees, Joshua Rosenblatt, had invited Ms. Borzilleri to join her new intelligence unit and that Ms. Borzilleri had expressed enthusiasm about the possibility of working for Mr. Rosenblatt, and by extension Ms. Mosby, in this unit. *Id.* ¶ 23. Ms. Mosby's failure to identify any *actual* negative effect on the Office's provision of public services is alone sufficient to resolve the *Pickering* balancing inquiry in Ms. Borzilleri's favor at this stage in the litigation. *See Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006) (denying motion to dismiss free speech claim brought by public employee where "[n]othing in the Amended Complaint indicates" harm to efficient government operations caused by the employee's speech).

The Complaint's allegations further make clear that Ms. Mosby's termination of several veteran prosecutors as reprisal for engaging in constitutionally protected expression *impaired* the ability of the State's Attorney's Office to fulfill its mission. Most immediately, Ms. Mosby's decision to terminate the prosecutors with no prior notice significantly damaged the Office's ability to prosecute the hundreds of pending cases assigned to those prosecutors, many of which involved violent crimes. Compl. ¶ 38. Ms. Mosby went so far as to terminate a prosecutor during a lunch break in the middle of a trial for a defendant accused of a violent crime, assigning a different attorney with no prior knowledge of the case to complete the trial that afternoon. *Id.* ¶ 40. Predictably, the defendant in that case was acquitted. *Id.* In another case, a court dismissed firearms and drug charges against a man named Dontae Small after the prosecutor

handling the case was fired by Ms. Mosby. *Id.* ¶ 39. Months later, Dontae Small was arrested and charged with stealing a car at gunpoint, driving the stolen vehicle through a guarded checkpoint and crashing into a fence at Fort Meade, a secure facility. *Id.* An even more tragic sequence unfolded after arson threat and other charges were dropped against a man named Keith Watts after the case was reassigned from Ms. Borzilleri. A few months after his release, Keith Watts was apparently murdered on a street corner in West Baltimore. *Id.* ¶ 41. These grim examples illustrate a broader trend: as one commentator, a former Assistant State's Attorney, has noted, the terminated prosecutors' "cases were redistributed to new prosecutors who were forced to try the cases unprepared or plea them to incredibly low sentences" and "five individuals who murdered someone in the City of Baltimore were previously released in cases under Ms. Mosby's administration." *Id.* ¶ 44.

The Complaint's allegations support a reasonable inference that Ms. Mosby knew that abruptly terminating prosecutors would compromise the State's Attorney's Office's ability to prosecute the cases once assigned to those prosecutors. Given her previous service as a line prosecutor, Ms. Mosby knew that attorneys are not immediately interchangeable and that reassigning cases without any transition period would sacrifice valuable case-specific knowledge and experience. *See id.* ¶¶ 9-10, 38. And any doubt that Ms. Mosby knew her actions would compromise the Office's ability to prosecute pending cases is put to rest by the fact that she agreed to delay plans to terminate an attorney who was in the middle of a felony trial because that attorney's supervisor complained that carrying out the planned termination would damage the Office's ability to proceed in that case. *Id.* ¶ 34.

The negative ramifications of Ms. Mosby's actions extend beyond the damage wrought by specific unsuccessful prosecutions. Seeing their colleagues unjustly fired for exercising their

First Amendment rights, several dozen prosecutors left the Office of their own volition. *Id.* ¶ 43. This massive turnover—comprising more than 20% of the Office's attorneys in less than a year—coincided with an increase in crime, with the Baltimore City murder rate rising to record levels. *Id.* ¶ 46. As a result, Ms. Mosby's actions deprived the State's Attorney's Office of experienced, professional prosecutors like Ms. Borzilleri at the moment they were needed most.

### iii. *Accepting Ms. Mosby's Position In This Case Would Eradicate Public Employees' First Amendment Right To Free Political Expression.*

Ms. Mosby cannot point to any *actual* negative effects that Ms. Borzilleri's speech had on the State's Attorney's Office's operations, nor does she deny the many ways in which the termination of career prosecutors like Ms. Borzilleri impaired the Office's ability to efficiently and effectively serve the people of Baltimore City. *See* Def. Br. at 16-18. Instead, Ms. Mosby broadly asserts that every Assistant State's Attorney is her "alter ego" that "should not be on the record as supporting another candidate for the job" of State's Attorney. *Id.* at 18. The breadth of this position is extraordinary. In Ms. Mosby's world, every single Assistant State's Attorney is duty bound to express political support for no one but her during the course of the next election campaign, at risk of their immediate termination. Ms. Mosby advocates discarding *Pickering* entirely, and replacing it with a rule that strips First Amendment speech rights from all public employees who are charged with implementing the policies of an elected official. *Id.* Such a rule would trample the First Amendment's "major purpose . . . to protect the free discussion of government affairs," *Mills v. Alabama*, 384 U.S. 214, 218 (1966), by removing from public debate the voices of "the members of a community most likely to have informed and definite opinions" regarding the government's functioning. *Pickering*, 391 U.S. at 572. It would also fatally undermine Maryland statutory law protecting the rights of public employees to "express

any political opinion." Md. Code, State Personnel and Pensions Article, § 2–304.

Ms. Mosby's blanket presumption that any employee who works to implement the policies of an elected official may be fired for their political expression also flies in the face of how the Supreme Court and the Fourth Circuit have interpreted and applied *Pickering* balancing. To prevail on this question, the government must articulate with specificity how a public employee's speech *actually* impaired the provision of government services. *See Pickering*, 391 U.S. at 572-73 (striking the balance in favor of the teacher's expressive rights because his speech "neither [was] shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally"). Even where the government has succeeded in articulating a valid theory describing possible disruptive consequences of an employee's speech, that theory must be borne out by record evidence before a court may dismiss the employee's First Amendment claim. *McVey*, 157 F.3d at 279 (remanding for fact discovery on the government's interest in suppressing employee speech in a claim brought by the manager of an airport).[5]

Finally, Ms. Mosby's contention that the "nature of the[] duties" assigned to Assistant State's Attorneys are so sensitive that their past political expression in support of another candidate can be presumed "to undermine Ms. Mosby's ability to implement the policies of her

---

[5] *See Ridpath*, 447 F.3d at 318 (remanding for fact discovery on *Pickering* balancing because "[n]othing in the Amended Complaint indicates . . . that his comments impaired the maintenance of discipline, hurt workplace morale, or constituted an abuse of his position); *see id.* ("Once a factual record is developed through discovery, the evidence could support the inference that Ridpath's workplace was impaired as a result of his comments . . . . Such a question, however, is not to be assessed under Rule 12(b)(6) but in Rule 56 summary judgment proceedings."); *Lane*, 134 S. Ct. at 2381 (finding no government interest in suppressing employee's speech where, following full discovery, "[t]here is no evidence, for example, that [the speech] was false or erroneous" or "disclosed any sensitive, confidential, or privileged information").

17

new administration" is demonstrably false.   It is a matter of public record that Ms. Mosby's most senior political hire, Chief Deputy State's Attorney Michael Schatzow, was a prominent supporter of Mr. Bernstein who donated several thousand dollars to his primary campaign against Ms. Mosby.[6]   Accordingly, Ms. Mosby's assertion that it necessarily impairs the functioning of the State's Attorney's Office for any attorney in the Office—each of whom is her "alter ego"—to "be on the record as supporting another candidate" is plainly a post-hoc rationale developed solely for the purpose of this litigation.   Like Ms. Mosby herself, who continued to serve as a loyal line prosecutor under Mr. Bernstein when her preferred candidate was defeated, Ms. Borzilleri "expressed enthusiasm" at the prospect of serving under Ms. Mosby.   Compl. ¶ 23.   No basis exists for inferring that Ms. Borzilleri's continued employment would have had *any* detrimental effect on the State's Attorney's Office, let alone an effect sufficiently substantial to outweigh Ms. Borzilleri's fundamental speech rights.

C. The Complaint Plausibly Alleges That Ms. Borzilleri Was Terminated In Retaliation For Her Political Expression.

As Ms. Mosby acknowledges, the Complaint alleges that she "terminated Ms. Borzilleri for the sole reason that Ms. Borzilleri had expressed political support for Gregg Bernstein in the 2014 Democratic primary election for State's Attorney for the City of Baltimore."  Def. Br. at 1-2.   Nowhere in her brief does Ms. Mosby dispute the adequacy of this allegation.    In fact, Ms. Mosby's arguments are all predicated on the assumption that she did, in fact, terminate Ms. Borzilleri in retaliation for her political expression.   *See* Def. Br. at 16 (arguing that

---

[6] Justin Fenton, *Marilyn Mosby says prosecutors can be fired for not showing political support*, The Baltimore Sun, Jan. 21, 2016, http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-mosby-lawsuit-response-20160121-story.html.

dismissal is appropriate "even if Ms. Mosby had terminated Ms. Borzilleri for her political expression").

Even if Ms. Mosby had contested the point, the Complaint's allegations regarding causation are more than sufficient to support a reasonable inference that Ms. Borzilleri's "speech was a substantial factor in the . . . termination decision." *McVey*, 157 F.3d at 278. The Complaint specifically alleges that Ms. Mosby learned about Ms. Borzilleri's political expression from a mutual friend, who viewed photos of the campaign event at Ms. Borzilleri's home on Facebook. Compl. ¶ 14. Thereafter, Ms. Mosby expressed her displeasure by glaring directly at Ms. Borzilleri in public on at least two occasions. *Id.* ¶ 18. Further, the day of Ms. Mosby's investiture, another of Ms. Mosby's deputies, Joshua Rosenblatt, pulled Ms. Borzilleri aside and demanded that she explain her connection to Mr. Bernstein's campaign, which she did. *Id.* ¶ 24. The following day, Mr. Rosenblatt escorted Ms. Borzilleri to a meeting at which she was fired, during which time he "confirmed that the meeting related to their conversation the day before about her support for Mr. Bernstein's campaign." *Id.* ¶ 26.

D. <u>Ms. Borzilleri's Speech Claim Is Independent From Her Association Claim.</u>

Ms. Mosby erroneously suggests that public employees have no right to free political expression independent from their right to free political association. *See* Def. Br. at 14 (describing the free speech claim as an "alternative theory" of liability, and stating that "[i]t is not clear that [the free expression claim] is even distinct from [the free association claim]"). The Supreme Court, however, has made clear that "[w]here a government employer takes adverse action on account of an employee['s] . . . right of free speech," courts apply the "balancing test" from the *Pickering* line of cases. *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 719 (1996). The Court has similarly recognized that violations of a public employee's rights to

free expression and to free association give rise to distinct claims that must be assessed separately. *Id.* ("Our cases call for a different, though related, inquiry where a government takes adverse action on account of an employee or service provider's right of free speech. There, we apply the balancing test from *Pickering* . . ."). In case after case, the Supreme Court has adjudicated free expression claims by public employees without considering whether the nature of their positions would preclude a separate free association claim. *E.g.*, *Lane*, 134 S. Ct. at 2381 (holding that termination of the Director of a statewide program for underprivileged youth violated the free speech clause of the First Amendment, and that "the employer's side of the *Pickering* scale is entirely empty"). Indeed, the Supreme Court has twice applied *Pickering* to address free speech claims brought by assistant prosecutors. *See Garcetti*, 547 U.S. at 418 (considering Los Angeles Deputy District Attorney's free expression claim under the *Pickering* standard);[7] *Connick v. Myers*, 461 U.S. 138 (1983) (same, for New Orleans Assistant District Attorney). The Fourth Circuit has similarly recognized that a retaliatory discharge based on both an employee's political expression and her political association gives rise to distinct First Amendment claims that must be assessed separately. *See, e.g., Smith v. Frye*, 488 F.3d 263, 266-67 (4th Cir. 2007).[8]

---

[7] Unlike Ms. Borzilleri, the plaintiff in *Garcetti* was a "deputy" to the District Attorney who exercised "supervisory responsibilities over other lawyers." 547 U.S. at 413. No member of the Supreme Court indicated that the *Garcetti* plaintiff's right to raise a free speech claim was in any way constrained by the free association clause of the First Amendment, or by his supervisory position.

[8] *Smith*, 488 F.3d at 266-67 ("Ms. Smith's [free expression] claim failed because she had not spoken or expressed herself in any way. . . . but we agree with Ms. Smith that we must also review the claim that her firing violated her First Amendment associational rights"); *Jones v. Dodson*, 727 F.2d 1329 (4th Cir. 1984) ("raw patronage discharges of the *Elrod/Branti* type are properly treated as a narrow, special case within the wider category of First Amendment

Ms. Mosby citation to the Fourth Circuit's observation that the free speech and free association inquiries "tend[] to merge" in many cases does not alter the fundamentally separate nature of those inquiries. At most, the free association and free expression inquiries may merge where a plaintiff's political expression does no more than indicate political affiliation with a particular candidate. *See Bland v. Roberts*, 730 F.3d 368, 384-86, 388 (4th Cir. 2013) (employee's speech "conduct consisted of his 'liking' [a candidate's] campaign page on Facebook); *McVey*, 157 F.3d at 274 (employee's speech was "her refusal to sign" a FOIA request form).[9] Here, by contrast, the expressive nature of Ms. Borzilleri's speech went far beyond merely affiliating with Mr. Bernstein's campaign. Among other things, she distributed leaflets articulating the reasons she supported Mr. Bernstein, and spoke publicly on his behalf at a gathering held in her home. *See Schenck v. Pro-Choice Network of Western NY*, 519 U.S. 357, 377 (1997) ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment"). Such core expressive speech cannot reasonably be limited to mere expression of affiliation with Mr. Bernstein's campaign.

E. Ms. Mosby Is Not Entitled To Qualified Immunity From The Free Speech Claim.

Qualified immunity will not "protect government officials performing discretionary functions from civil damage suits . . . only if it appears that (1) they violated a statutory or

---

discharges. . . . Where the protected activity involves overt 'expression of ideas,' the more open-ended inquiry prescribed by *Pickering* and its progeny are required to accomplish the necessary balancing"); *see also Joyner v. Lancaster*, 815 F.2d 20, 22 (4th Cir. 1987) (applying *Pickering* test where deputy sheriff was terminated after he expressed political support for sheriff's opponent).

[9] Ms. Mosby also cites *Knight v. Vernon,* 214 F.3d 544 (4th Cir. 2000). Def. Br. at 15. That case is irrelevant on this point. The plaintiff in that case did not assert a free speech claim, nor did she allege she was terminated in retaliation for her expression. *Id.* at 548.

constitutional right of the plaintiff, and (2) the right was 'clearly established' at the time of the acts complained of such that an objectively reasonable official in their position would have known of the right." *McVey*, 157 F.3d at 276. Both of these elements are satisfied here. First, for the reasons described, Ms. Borzilleri has stated a claim for violation of her First Amendment right to free expression under the *Pickering* framework.[10] Second, under that framework, it has been clearly established for nearly half a century that terminating a public employee in retaliation for speech on a matter of public concern violates the First Amendment unless the government can point to specific countervailing harms caused by the employee's speech that overwhelm the individual's speech rights. *E.g., Pickering*, 391 U.S. at 579-80. As set forth above, Ms. Mosby has identified no valid government interest in suppressing Ms. Borzilleri's political expression, and harm caused by that speech cannot "be presumed." *Id.* at 572.

Moreover, in her opening brief, Ms. Mosby makes no specific argument that Ms. Borzilleri's free *speech* rights are not clearly established, instead directing her arguments on qualified immunity solely to the distinct free *association* claim. *See* Def. Br. at 20-21 (citing *Branti* and *Jenkins*, which addressed only free association claims). Because "arguments not

---

[10] "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Accordingly, it is broadly recognized as "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5 (1998); *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (resolving the constitutional question first is "often beneficial" in that it "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."); *Lane*, 134 S. Ct. at 2381 (addressing qualified immunity only after finding a violation of plaintiff's free speech rights under the *Pickering* framework).

raised in the opening brief are considered waived," *Billingslea v. Astrue*, 502 F. App'x 300, 301, n.1 (4th Cir. 2012), Ms. Mosby's failure to articulate any specific argument that Ms. Borzilleri's free speech rights were not clearly established is controlling.

## II.     Ms. Borzilleri Has Stated A Claim For Violation Of Her Free Speech Rights Under Article 40 Of The Maryland Constitution.

Article 40 of the Maryland Declaration of Rights provides "that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects." The Maryland Court of Appeals "interpret[s] the protections of Article 40 as generally 'co-extensive' with the protections of the First Amendment" of the Federal Constitution. *Newell*, 967 A.2d at 743, n.11 (quoting *Jakanna Woodworks, Inc. v. Montgomery County*, 689 A.2d 65, 70 (Md. 1997)). For all the reasons that apply to Ms. Borzilleri's free expression claim under the First Amendment, she has stated a corresponding claim for violation of Article 40.

While "[t]he guaranty of freedom of speech . . . ordained in Art. 40" is "substantially similar to that enunciated in the First Amendment," *Jakanna*, 689 A.2d at 70, the Maryland Court of Appeals is the nevertheless the ultimate expositor of Maryland law. *See Mitcheson v. Harris*, 955 F. 2d 235, 237 (4th Cir. 1992). Accordingly, to the extent federal and state law diverge, federal case law interpreting the First Amendment cannot override the Maryland Court of Appeals' application of Article 40. As relevant here, the Maryland Court of Appeals has specifically held that, under Article 40, the claims of public employees who were terminated by an incoming State's Attorney in retaliation for expressive support of another candidate must be considered under the *Pickering* framework. *Newell*, 967 A.2d at 754-55 ("the *Pickering* test [applies] to hybrid cases involving employee discharges based on elements of speech or

expressive conduct and elements of political support or lack thereof").[11]  Furthermore, the Maryland Court of Appeals specifically denied qualified immunity to a State's Attorney accused of terminating employees in retaliation for their political expression, holding that "Plaintiffs generated a jury question" regarding the lawfulness of their termination under the *Pickering* balancing test.  *Id.* at 761-72.  Even if there were any doubt as to whether Ms. Borzilleri has stated a free expression claim under the First Amendment of the U.S. Constitution, there can therefore be no doubt that she has stated a corresponding claim under Article 40 of the Maryland Declaration of Rights.[12]

### III.    Ms. Borzilleri Has Properly Stated A Claim For Patronage Dismissal In Violation Of Her First Amendment Right To Free Association.

For decades, the Supreme Court's decisions in *Elrod v. Burns* and *Branti v. Finkel* have protected public employees from being fired during a political transition.  *See Smith*, 488 F.3d at 269 (stating that it generally violates the First Amendment for "newly elected or appointed officials [to] fire supporters of their rivals during a political transition").  In *Elrod*, the Court held that a newly elected Sheriff could not discharge non-policymaking employees of his office,

---

[11] In *Newell*, the Maryland Court of Appeals held that the *Elrod/Branti* patronage dismissal test only applies to claims that "show political patronage as the *sole motive* of discharge" whereas the [*Pickering*] public concern test applies where the retaliation is motivated in part by the plaintiffs' "expressive conduct."  967 A.2d 729, 755 (Md. 2009); *id.* at 754 ("we decline to hold here that an employee's status as a policymaker gives the government the categorical right to fire the employee based on the employee's speech or conduct"); *O'Leary v. Shipley*, 545 A.2d 17 (Md. 1988) (same).  The Court of Appeals also made clear that "campaign activity" is treated like all other speech and expressive conduct, and therefore may serve as the basis for a *Pickering* speech retaliation claim.  *Newell*, 967 A.2d at 755 ("[T]he mere fact that an employee engaged in campaign activity does not invite application of the *Elrod/Branti* test; if the speech itself contributed to the employer's decision to fire her or him, the *Pickering* balancing test applies.").

[12] For the reasons stated *infra* in Section IV, Ms. Mosby does not enjoy statutory immunity from this claim under Maryland law.

including a Deputy Sheriff, simply because they were not members of the same political party. "[P]atronage dismissals severely restrict political belief and association," which "constitute the core of those activities protected by the First Amendment." 427 U.S. 347, 356 (1976). The Court outlined the many costs of political patronage, including the restraint on freedoms of belief and association, the hindering of a free functioning electoral process, and the inefficiency resulting from wholesale replacement of established public employees. *Id.* Given these dire consequences, the government bears the burden of proving it has an interest that outweighs the public employee's interests. *Id.* at 362 ("The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest.").

The Court modified the *Elrod* standard in *Branti*: "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. 507, 518 (1980). The Court held that the free association clause forbids a public defender from firing assistant public defenders for the sole reason they were members of the Republican party because partisan interests do not bear on an assistant public defender's effectiveness at his job. *Id.; see also O'Hare*, 518 U.S. at 717 ("A State may not condition public employment on an employee's exercise of his or her First Amendment rights.").

Ms. Borzilleri more than satisfactorily alleges a violation of her rights to free association under the First Amendment and Article 40. She plausibly alleges that she was fired solely for political reasons, opening the line of inquiry for patronage dismissal under *Elrod-Branti*. Further, the Complaint alleges more than sufficient factual material to support a reasonable inference that political affiliation is not an appropriate job requirement for career prosecutors.

A.  Ms. Borzilleri Was Fired For Supporting Ms. Mosby's Political Rival.

The *Elrod-Branti* test applies whenever political activity or support becomes a job requirement. *Jenkins v. Medford*, 119 F.3d 1156, 1160 (4th Cir. 1997). The Complaint sets forth detailed allegations that Ms. Borzilleri engaged in overt political association with Mr. Bernstein's re-election campaign for State's Attorney, including by hosting a campaign event for him at her home, and that Ms. Mosby was aware of Ms. Borzilleri's political affiliation. Compl. ¶¶ 14-17. Ms. Mosby also does not dispute that her decision to terminate Ms. Borzilleri was motivated by her political affiliation and had nothing to do with Ms. Borzilleri's work performance. Instead, she argues that Ms. Borzilleri's termination was nevertheless lawful because "prosecutors may be fired for political reasons." Def. Br. 6. This broad position misapplies the Supreme Court's decisions in *Elrod* and *Branti*, as well as the Fourth Circuit's decisions applying those foundational cases.

B.  Ms. Mosby's Conduct Is Unlawful Under The *Elrod-Branti* Standard.

i.  *The Elrod-Branti Standard And The Jenkins Test Are Fact- And Context-Specific.*

The *Elrod-Branti* standard directs courts to ask whether "political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare*, 518 U.S. at 714; *id.* at 719 ("the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required"). To be an appropriate job requirement, political affiliation must have a "rational" link between partisanship and job performance. *Nader v. Blair*, 549 F.3d 953, 959 (4th Cir. 2008). In *Jenkins*, the Fourth Circuit refined the *Elrod-Branti* inquiry with a two-step fact- and context-specific test: (1) the court must determine if the position of the dismissed employee was related to partisan political interests, and (2) *if the position is related to political interests*, the court must then analyze the specific responsibilities

held by an employee in that position. *Jenkins*, 119 F.3d at 1162.

For the first prong of the *Jenkins* test, resemblance to a policymaking or confidential position might be a relevant consideration, but the ultimate question is whether the position *relates to partisan interests*. The *Jenkins* court carefully reiterated the Supreme Court's position in *Branti* that "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position," and that there must be "a *rational connection* between shared ideology and job performance." *Id*. at 1161 (citation omitted) (emphasis added). The categories of "policymaker" and "confidential" are therefore mere shorthands for the fact-intensive reasonableness inquiry. Policymaking and confidential positions that do not relate to partisan political interests are protected by the First Amendment.

    ii.    *Ms. Borzilleri's Position As A Career Prosecutor Did Not Relate To Partisan Political Interests.*

Here, the Court need not reach the second part of the *Jenkins* test because the position of Assistant State's Attorney does not relate to partisan political interests. Ms. Mosby's motion to dismiss offers no reason why the position of an Assistant State's Attorney requires adherence to a particular set of political beliefs or affiliations. Instead, the only argument in support of dismissal of the free association claim is that Assistant State's Attorneys are "policymakers"— yet the *Jenkins* test requires the employer first show the position relates to "partisan political interests," which in accordance with the Supreme Court in *Branti*, is separate from whether a position is policymaking or confidential. *Jenkins*, 119 F.3d at 1162. For this reason alone, Ms. Mosby's motion to dismiss this claim must be denied.

Even if she had tried to make such a showing, Ms. Mosby could not satisfy her burden in this respect because career prosecutors are not political actors. "[C]ourts examine the job duties

of the position, and not merely the title," in resolving this inquiry. *Id.* at 1165. The duties and responsibilities of career prosecutors are not—and should not be—influenced by their political affiliations and beliefs. Political determinations are made by elected officials, or political appointees selected by elected officials. Career prosecutors are duty bound to faithfully carry out those policies for the public good, without regard to their personal political beliefs. A just criminal justice system requires that career prosecutors carry out their duties in a neutral and apolitical manner. Their duties to execute the law faithfully exist regardless of the State's Attorney in power or for whom they voted. Indeed, in previous transitions to a newly elected State's Attorney, line prosecutors have remained in their positions without regard to their political affiliations. In this way, prosecutorial duties are similar to those of public defenders in *Branti*.

### iii. Ms. Borzilleri Never Held A Confidential Or Policymaking Position.

It is clear Ms. Borzilleri never held a policymaking position, or one that was "confidential" in the relevant sense. Supervisors assigned cases to Ms. Borzilleri, and she regularly consulted supervisors on charging and plea decisions. She had no authority over the overall operation or orientation of the State's Attorney's Office. She did not even have formal supervision over any other attorney. There was no expectation of a change in her fundamental responsibilities from administration to administration across her over nine years at the Office. She had no access to confidential information other than that which related to her cases.

As community prosecutor, she represented the State's Attorney's Office, not Gregg Bernstein, and answered questions on criminal law from the public. This was not a partisan exercise. *Knight v. Vernon*, 214 F.3d at 551 ("Ms. Knight's contact with visitors did not make her a 'communicator' who was stripped of First Amendment protection.") As the Fourth Circuit

has explained:

> [C]ontact [with the public] alone does not make an employee a 'communicator' within the meaning of *Elrod*—a telephone operator, a tour guide at the State Capitol, and a bus driver are all in constant contact with the public—however, no one would seriously argue that the positions are outside *Elrod* and *Branti*'s protection.

*Akers v. Caperton*, 998 F.2d 220, 224 (4th Cir. 1993). Ms. Mosby's does not offer any reasoned basis for her assertion that mere contact with the public suffices to render political loyalty a reasonable job requirement.[13]

    C. *Jenkins v. Medford* Was Limited To North Carolina Deputy Sheriffs.

Although Ms. Mosby relies heavily on *Jenkins v. Medford*, it is distinguishable. *Jenkins* held that deputy sheriffs in North Carolina may be dismissed for their lack of political loyalty to the elected sheriff. By its terms, *Jenkins* was expressly limited to "the specific political and social roles of sheriffs and their deputies in North Carolina." 119 F.3d at 1163. The Court repeatedly qualified its statements to emphasize that its ruling was specific to North Carolina

---

[13] Contrary to Ms. Mosby's suggestion, no binding precedent holds that political loyalty is an appropriate job requirement for line prosecutors. Def. Br. 10. The Supreme Court in *Branti* specifically reserved decision on this question. *See* 445 U.S. at 519 n.13. Ms. Mosby points to the *Branti* Court's statement that the duties of public defenders stand "in contrast to the broader public responsibilities of an official such as a prosecutor." *Id.* In context, it is clear that the Court was referring to the broad responsibilities of *U.S. Attorneys* appointed by the President, not line attorneys like Assistant United States Attorneys. *See id.* ("We express no opinion as to whether the *deputy* of such an official could be dismissed."). The statement was apparently in reaction to Justice Stewart's assertion in dissent that the majority opinion could be construed as shielding U.S. Attorneys themselves from dismissal based on political affiliation. *Id.* at 524-25 (Stewart, J. dissenting) ("One example at the national level illustrates the nature and magnitude of the problem created by today's holding . . . Yet, it would be difficult to say, under the Court's standard, that 'partisan' concerns properly are relevant to the performance of the duties of a United States attorney. . . . I believe that the President must have the right to consider political affiliation when he selects top ranking Department of Justice officials."). There is no indication whatsoever that any Justice believed that *line prosecutors* could be fired for political reasons.

sheriffs' deputies. *Id. at* 1163-64 ("[T]hat *in North Carolina*, the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable. We therefore hold that such *North Carolina deputy sheriffs* may be lawfully terminated for political reasons.") (emphasis added); *see also id.* at 1164 ("district courts are to . . . examin[e] the specific position at issue"). In justifying its holding, the Fourth Circuit emphasized the "special role" of North Carolina sheriffs' deputies. *Id.* at 1162-63. The Court cited authority from both the North Carolina legislature and North Carolina courts that "[t]he North Carolina legislature has . . . recognized the special status of sheriffs' deputies in the eyes of the law." *Id.* at 1163. In further support of this special role, the Court cited North Carolina caselaw that a "sheriff can be held liable for the misbehavior of the deputies." *Id.* The Court even limited its dismissals to deputies "actually sworn to engage in law enforcement activities on behalf of the sheriff," so as not to encompass deputies who do not impose vicarious liability on the sheriff. *Id.* at 1165; *see id.* ("[C]ourts examine the job duties of the position, and not merely the title, of those dismissed.").

Ms. Mosby points to no analogous statement from the Maryland State legislature or Maryland courts regarding Assistant State's Attorneys. In fact, the Maryland legislature has enacted specific protections for all public employees, including Assistant State's Attorneys, for freedom of political affiliation. Ms. Mosby does not identify any authority that State's Attorneys in Maryland may be held vicariously liable for the acts of Assistant State's Attorneys. She therefore fails to satisfy her burden of establishing that the position of Maryland Assistant State's Attorney merits a special status that warrants curtailing First Amendment rights. *See Elrod,* 427 U.S. at 368 ("[I]t is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests.").

Ms. Mosby reads *Jenkins* as establishing a broad, universally applicable rule that any assistant charged with implementing the policies of an elected State official may be terminated based on his or her political affiliation. *See* Def. Br. at 7. As noted, this contradicts *Jenkins* on its own terms, as the Fourth Circuit repeatedly made clear the position-specific nature of the inquiry. 119 F.3d at 1164. Furthermore, the Fourth Circuit's subsequent caselaw confirms that *Jenkins* did not establish categorical rules, but was limited to the particular positions at issue. *See Sales v. Grant*, 158 F.3d 768 (4th Cir. 1998) (Assistant Registrars in the City of Lynchburg, Virginia may not be fired for political reasons, where the General Registrar is a political appointee); *Cooper v. Lee Cnty Bd. of Supervisors*, 188 F.3d 501, No. 98-2083, 1999 WL 631240, *1-3 (1999) (Deputy Commissioner of Revenue for Lee County, Virginia may not be fired for political reasons, even where the "Commissioner of Revenue is an independent constitutional officer"). Finally, Ms. Mosby's broad misreading of *Jenkins* contradicts the Supreme Court's decision in *Elrod* itself—which held that a deputy sheriff of Cook County, Illinois may not be terminated by a newly elected sheriff based on his political affiliation. *Elrod*, 427 U.S. at 350-51. The only possible way to square *Jenkins* with *Elrod* is to accept the *Jenkins* court's explicit guidance that it was pronouncing a rule that applies narrowly to North Carolina deputy sheriffs alone.

D. The Court Is Not Required To Determine Whether The Assistant State's Attorney Position Requires Partisan Affiliation At The Motion To Dismiss Stage.

Even if the Court has doubts as to whether the Assistant State's Attorney position requires a particular partisan affiliation, that question need not be resolved definitively at the motion to dismiss stage. Whether political affiliation is a reasonably appropriate job requirement is a mixed question of law and fact "involving as it does the application of a legal standard to a

particular set of facts." *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Only if the answer is "so obvious[] . . . that reasonable minds cannot differ" is the issue "appropriately resolved as a matter of law." *Id.* In *Kenney v. Charnock*, for example, the plaintiff investigators of a county prosecuting attorney's office alleged that their political views were irrelevant to their position. Although the defendants pointed to legislative language and other evidence that the role of an investigator is a policymaking and confidential one, the court held that *further discovery was required* to determine whether the county prosecuting attorney's political patronage was justified. 441 F. Supp. 2d 769, 775-76 (S.D.W. Va. 2006) *aff'd* 221 F. App'x 289 (4th Cir. 2007) ("[T]he Court believes the legislation and opinions cited by Defendants . . . do not provide enough clarity for the Court to determine whether an investigator holds a policymaking and/or confidential position subject to political patronage. Instead, further discovery is clearly necessary on this issue . . . the Court cannot resolve the issue at this point in the litigation."); *see also Rini v. Zwirn*, 886 F. Supp. 270, 302 (E.D.N.Y. 1995) ("It is not dispositive of this issue that Becker's position was not afforded civil service protection, and defined 'policymaker' by the defendants . . . the issue of whether Becker's position is considered 'policymaking' and thus subject to patronage based employment termination cannot be determined on a motion to dismiss."). Therefore, this Court does not need to rule on whether there is a reasonable partisan connection to the role of an Assistant State's Attorney at this early stage in the litigation.

    E.   <u>The Breadth Of Mosby's Position Has Wide-Ranging, Negative Implications For Attorney Public Servants.</u>

The practical consequences of the authority Ms. Mosby claims are astounding. She claims the right to fire any of her subordinate prosecutors for their political affiliations if they do

not accord with her own. Def. Br. at 5. By extension, according to Ms. Mosby's highly politicized vision of public employment, the First Amendment would not bar an incoming President from firing tens of thousands of federal employees on his first day in office, including thousands of career prosecutors at the Department of Justice, merely because they were members of the opposing political party.[14] Not only does this position conflict with the spirit of the First Amendment, it is also flatly inconsistent with the policymaking exception as originally conceived by the Supreme Court. *See Elrod*, 427 U.S. at 387 n.10 ("it is doubtful that any significant number of employees can be identified as policymakers"); *id.* at 364 ("One interest which has been offered in justification of patronage is the need to insure effective government and the efficiency of public employees . . . The inefficiency resulting from the wholesale replacement of large numbers of public employees every time political office changes hands belies this justification.").

F. Ms. Mosby is Not Entitled to Qualified Immunity From The Patronage Claim.

Ms. Borzilleri has pleaded a violation of her clearly established First Amendment rights under the free association clause. Almost 40 years have elapsed since the Supreme Court clarified that career public employees whose responsibilities do not include a partisan component continue to possess the right freely to associate with a political candidate or party of their choosing. *See Elrod*, 427 U.S. 347 (1976). The Complaint's allegations should be taken at their "their well-pleaded value . . . to show that a clearly established constitutional right had been violated." *Garnier v. Rodriguez*, 506 F.3d 22, 28 (1st Cir. 2007) (stating that if "it does not

---

[14] Even if the First Amendment does not apply, federal civil service protections would prevent an incoming President from taking such actions. *See* 5 U.S.C. § 2302. Similarly here, if the First Amendment does not apply, Maryland common and statutory law serve as a backstop preventing this untenable outcome.

appear 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' . . . the qualified immunity defense is not established at this early stage of the litigation."); *see also Kenney*, 441 F. Supp. 2d at 776 ("as the issue of qualified immunity is before this Court on a motion to dismiss and discovery has just begun, the Court finds . . . that there is simply not enough clarity at this point in the litigation for the Court to determine whether Defendants are entitled to such immunity.").[15]

## IV.   The Amended Complaint States A Common Law Claim For Abusive Discharge.

Under Maryland common law, the tort of abusive discharge protects at-will employees from being terminated in contravention of a clear mandate of public policy. *See Newell*, 967 A.2d at 769. Even if this Court were to find that Ms. Borzilleri's termination did not violate her rights under the federal and Maryland constitutions, which it does, she has pleaded all the required elements of a cause of action for abusive discharge.[16]

### A.   Terminating Non-Supervisory Public Employees For Political Reasons Contravenes The Public Policy That Protects Maryland Employees' Right To Participate In Political Activities And Express Political Opinions.

The Maryland legislature has expressly recognized the public policy interest in preserving government employees' right to engage in the political process, granting them the

---

[15] For all the reasons that apply to Ms. Borzilleri's free association claim arising under the First Amendment (Count I), Ms. Borzilleri has stated a corresponding claim under Article 40 of the Maryland Declaration of Rights. *See Newell*, 967 A.2d at 737 (employee who held position of Senior District Court Coordinator stated a claim for patronage dismissal under Article 40 when she was terminated by an incoming State's Attorney).

[16] Because the purpose of this tort is to "provide a remedy for otherwise unremedied public policy violations," wrongfully terminated employees only state a cause of action for abusive discharge if they have no alternative remedy available to vindicate their rights. *Newell*, 967 A.2d at 769. At the motion to dismiss stage, however, a plaintiff is permitted to proceed based on alternate theories of relief. *See id.* (alternate theories permissible on summary judgment).

ability to "freely participate in any political activity and express any political opinion," subject only to the restrictions that they not "engage in political activity while on the job during working hours" or "advocate the overthrow of the government by unconstitutional or violent means." Md. Code, State Personnel and Pensions Article, § 2–304 (State employees); Md. Code, Local Government, § 1-303 to 304 (local government employees). The Maryland Court of Appeals has specifically held that these statutory provisions constitute clear mandates of public policy that give rise to an abusive discharge claim. *Newell*, 967 A.2d at 765-70. The Court explained, moreover, that these "statutes . . . provide public employees with greater protection than that required by the Federal and State Constitutions." *Id.* at 766. Therefore, abusive discharge claims arising under these provisions are "not duplicative of [a plaintiff's] constitutional claims" under the First Amendment and Article 40 of the Maryland Constitution. *Id.* at 769.

Defendant does not dispute that Ms. Borzilleri has stated a claim under Maryland law for abusive discharge. *See* Def. Br. at 21-24. Instead, her sole argument for dismissal of this claim is that Ms. Mosby should be afforded statutory immunity from this well-pleaded claim. *Id.* This argument lacks merit.

B.  Statutory Immunity Cannot Shield Ms. Mosby's Unlawful Actions.

In an effort to insulate Ms. Mosby's conduct from judicial review, defendant's brief argues that the Maryland Tort Claims Act's ("MTCA") statutory immunity provision protects her acts of political retribution. Section 5-522 of the Maryland Code's Courts and Judicial Proceedings chapter, provides, in relevant part that "State personnel . . . are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence. . . ." Md. Code, Cts. & Jud. Proc. § 5-522(b). Not only is this argument inconsistent with legal

precedent, but it also ignores the well-pleaded facts in the Complaint.

What constitutes gross negligence and malice in any given case is a fact-sensitive inquiry, and courts have resisted creating bright-line rules to define what rises to the level of gross negligence or malice. *See Newell*, 967 A.2d at 763 ("Both malice and gross negligence are amorphous concepts."). Instead, Maryland courts have held that "the determination of whether a State actor enjoys State personnel immunity is a question for the trier of fact." *Id.*[17] It is therefore normally inappropriate to resolve questions of statutory immunity at the pleadings stage. Pursuant to requirements of Rule 8, a common law claim for abusive discharge may proceed against Ms. Mosby if the Complaint "adequately plead[s] malice or gross negligence," or facts that allow a court to draw a reasonable inference that Ms. Mosby acted with gross negligence or malice to survive a motion to dismiss. Def. Br. 21-22. As discussed below, the Complaint contains numerous facts from which a court could infer gross negligence or malice.

### i. The Facts Support An Inference That Ms. Mosby Acted With Actual Malice.

"In cases involving allegations of malice, well-pled facts showing 'ill-will' or 'evil or wrongful motive'" may overcome statutory immunity under the MTCA. *Barbre*, 935 A.2d at 714. Appreciating that a state official who acts with malice rarely will disclose her true motivation, Maryland courts have acknowledged that "[a]ctual malice. . . does not always have to be shown with specificity; it may be inferred." *Behan v. Gagliano*, 581 A.2d 854, 856 (Md.

---

[17] *See also Barbre v. Pope*, 935 A.2d 699, 714 (Md. 2007) (holding that summary judgment was inappropriate where facts could lead trier of fact to conclude an officer acted with malice or gross negligence); *Okwa v. Harper*, 57 A.2d 118, 128-129 (Md. 2000), *R.E. Linder Steel Erection Co., Inc. v. Wedemeyer, Cernik, Corrubia, Inc.,* 585 F. Supp. 1530, 1534 (D. Md. 1984) ("cases involving malice necessarily call defendant's state of mind into question and summary judgment often will be refused when that issue is raised.") (quotation marks omitted).

1999). For example, in *Newell*, the Maryland Court of Appeals held that the Caroline County State's Attorney was not entitled to statutory immunity on the abusive discharge claims brought by former State's Attorney's Office employees even though the State's Attorney never admitted that he fired the employees for political reasons. 967 A.2d at 765-70. As in this case, the former employees in *Newell* alleged that a newly-elected State's Attorney had fired them in retaliation for their support of his predecessor. *Id.* Addressing the State's Attorney's argument that the plaintiffs could not demonstrate malice, the *Newell* court noted that the incoming State's Attorney was agitated by the employees' support for his political opponent and stated that he planned to retain employees without "work ethic issues," but told the employees being fired that their work performances "were not the problem." *Id.* at 764. The State's Attorney also told one plaintiff in a sarcastic tone that her campaign activity was "absolutely not" the reason for her termination. *Id.* at 740. In these circumstances, the Maryland Court of Appeals wisely observed that this collective evidence could lead a reasonable fact-finder to infer that Newell fired the plaintiffs as "a targeted act of retribution." *Id.* at 764.

Ms. Mosby briefly attempts to distinguish *Newell* by asserting that her malicious acts against Ms. Borzilleri occurred when Ms. Borzilleri was on the job, rather than speaking as a citizen. Def. Br. at 23. Curiously, this discussion omits any mention of the many factual allegations that show that Ms. Mosby retaliated against Ms. Borzilleri for her private speech. Accepting the Complaint's well-pleaded allegations as true, it is more than facially plausible that Ms. Mosby fired Ms. Borzilleri because of Ms. Borzilleri's private speech. The Complaint also alleges that Ms. Mosby learned about Ms. Borzilleri's private expressions of support for Mr. Bernstein's campaign through her appointed political deputies. Compl. ¶¶ 14-15, 20, 24, 63, 70. That multiple supervisors in Ms. Mosby's office sought information about and referred to

Ms. Borzilleri's campaign activities for Bernstein is unquestionably relevant to Ms. Mosby's subjective motive for firing Ms. Borzilleri. These facts suffice, under *Newell*, to establish that Ms. Mosby acted with malice, and therefore cannot claim the protections of MTCA statutory immunity.

Although those facts alone are sufficient to plausibly infer that Ms. Mosby acted out of malice, the Complaint also alleges that Ms. Mosby, like the State's Attorney in *Newell*, has offered inconsistent explanations about Ms. Borzilleri's firing. Ms. Mosby's letter terminating Ms. Borzilleri indicated that the termination was "without cause." *Id.* ¶ 27 and Ex. B. Yet, when Ms. Borzilleri requested that Ms. Mosby's office provide documentation to the local pension office that would confirm that Ms. Borzilleri was laid off through no fault of her own, Ms. Mosby's office flatly refused, thereby preventing Ms. Borzilleri's pension from vesting. *Id.* ¶¶ 54-55. In April 2015, Ms. Mosby's Chief of Administration sent a letter to Ms. Borzilleri denying that her position had been eliminated and failing to provide any statement that Ms. Borzilleri was laid off. *Id.* ¶ 55 and Ex. E. Only after Ms. Borzilleri notified the State's Attorney's Office that she intended to pursue a claim against that office for unlawful discharge did Ms. Mosby change the purported reason for Ms. Borzilleri's termination to a lay-off. *Id.* ¶ 59. Ms. Mosby's shifting explanation for Ms. Borzilleri's termination is no different than the State's Attorney in *Newell*, who sarcastically stated that he was not firing the plaintiffs for political reasons. Furthermore, Ms. Mosby is on record making light of the firings of prosecutors, drawing an inappropriate analogy between firing career prosecutors and a football team changing coaches. *Id.* ¶ 42.

The factual allegations concerning Ms. Mosby's treatment of other Assistant State's Attorneys provide additional bases for finding malice. The Complaint alleges that, at a political

event, Ms. Mosby made a throat-slitting gesture to a career prosecutor, who happened to be seated next to Gregg Bernstein. *Id.* ¶ 32. That attorney, who became another vocal Bernstein supporter, voluntarily resigned in January 2015, when Ms. Mosby took office. *Id.* ¶¶ 33-34. Ms. Mosby nevertheless tried to fire that attorney in the middle of a felony trial. *Id.* ¶ 34. As detailed *supra*, Ms. Mosby fired several prosecutors with no notice, which predictably had detrimental effects on pending cases assigned to those prosecutors, as well as on attorney morale. Malice is the only plausible explanation for Ms. Mosby's willingness to jeopardize the effective operation of the State's Attorney's Office in this manner. These facts, if proven, establish that Ms. Mosby fired Ms. Borzilleri as a form of calculated political retribution.

Finally, Ms. Mosby's decision to subject Ms. Borzilleri to public humiliation following her termination is strongly indicative of malice. Ms. Borzilleri was paraded before her colleagues accompanied by an armed officer—a member of Ms. Mosby's personal security detail—who then stood in her office as she collected her belongings. *Id.* ¶ 27. For another attorney Ms. Mosby planned to terminate in retaliation for supporting Mr. Bernstein, Ms. Mosby ordered armed officers to wait in the attorney's office as the attorney returned from trial. *Id.* ¶ 35. Only malice could explain these actions.

### ii. The Facts Alleged Also Support An Inference That Ms. Mosby's Decision To Fire Ms. Borzilleri Was Grossly Negligent.

Although Ms. Mosby's brief contains no separate analysis for gross negligence, courts have long recognized the distinction between the intent required for malice and gross negligence. *Shoemaker v. Smith*, 725 A.2d 549, 560 (Md. 1999) (observing that the fact that malice "is an alternative to gross negligence . . . indicates clearly that the Legislature conceived of malice as something beyond the merely reckless or wanton conduct that would be embodied within gross

negligence"). While malice denotes an improper motive, gross negligence encompasses intentional conduct that is "wanton," "reckless," or "utterly indifferent to the rights of others." *Id*. at 560; *Barbre*, 935 A.2d at 717 (internal quotation and citation omitted).

*Newell* held, under a nearly identical set of facts, that a trier-of fact could infer that a State's Attorney's decision to fire employees who supported his political opponent "reflected a conscious disregard for their rights as employees." 967 A.2d at 765. Here, the Complaint alleges numerous facts from which one could infer Ms. Mosby acted with disregard for Ms. Borzilleri's common law right against abusive discharge. In particular, the Complaint alleges: (1) that Ms. Mosby viewed Mr. Bernstein's supporters as personal adversaries, Compl. ¶¶ 12, 32; (2) that her future deputies sought to determine the extent of Ms. Borzilleri's political support for Bernstein, *id.* ¶¶ 15, 20, 24, 63, 70; (3) that Ms. Mosby and her office provided inconsistent and incomplete rationales for firing Ms. Borzilleri, *compare id.* ¶ 27 and Ex. B *with id.* ¶ 55 and Ex. E; (4) that Ms. Mosby abruptly discharged Ms. Borzilleri and other Assistant State's Attorneys in a manner that could and did adversely impact pending prosecutions, *id.*¶¶ 34-40; and (5) that Ms. Mosby further demonstrated her disregard for her employees' rights by changing the handbook to incorrectly state that they could be fired "for any reason, or no reason at all," *id.*¶ 49. When read as a whole, the facts in the Complaint support a reasonable and logical inference that Ms. Mosby acted with gross negligence, at minimum, when she fired Ms. Borzilleri.

Finally, Ms. Mosby's argument that terminating an employee for political support alone is permissible under Maryland common law is contrary to precedent and cannot be reconciled with *Newell*. Over five years before Ms. Mosby assumed office, Maryland's highest court held that former employees could maintain a cause of action for abusive discharge if a *Maryland State's Attorney* discharged them for political reasons. *Newell*, 967 A.2d at 765-70. Viewing the

40

factual allegations in the light most favorable to the plaintiff, the Complaint alleges facts demonstrating that Ms. Mosby fired Ms. Borzilleri and several other Assistant State's Attorneys as "targeted reprisal" for their political support of Mr. Bernstein outside of the workplace. *Id.* at 765. Accordingly, Ms. Mosby is not entitled to statutory immunity.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that this Court deny defendant Mosby's motion to dismiss.

DATE:  March 10, 2016

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

*/s/ Stacey K. Grigsby*

Stacey K. Grigsby
  (Bar No. 28090)
  sgrigsby@bsfllp.com
Ryan Park
  (admitted pro hac vice, Bar No. 804517)
  rpark@bsfllp.com
5301 Wisconsin Avenue NW
Washington, DC 20015
Tel:  (202) 237-2727
Fax:  (202) 237-6131

Nafees Syed
  (pro hac vice pending, Bar No. 5326038)
  nsyed@bsfllp.com
575 Lexington Ave, 7th Floor
New York, NY 10022
Tel:  (212) 446-2300
Fax:  (212) 446-2350

*Attorneys for Plaintiff Keri Borzilleri*

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Local Rule 105.6, Plaintiff Keri Borzilleri respectfully requests a hearing on Defendant Marilyn Mosby's motion to dismiss.

**CERTIFICATE OF SERVICE**

I certify that on March 10, 2016, I caused the following to be served electronically through the ECF electronic filing system on:

Bradley J. Neitzel
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Attorney for Defendant Marilyn Mosby

/s/ *Stacey K. Grigsby*
Stacey K. Grigsby

**CERTIFICATE OF COMPLIANCE**

This brief complies with the volume limitation of Local Rule 105.3 because it is less than fifty (50) pages, excluding those parts of the brief exempted by that Rule.

Date: March 10, 2016

/s/ *Stacey K. Grigsby*
Stacey K. Grigsby