## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                      |        |                        |
|----------------------|--------|------------------------|
| KERI L. BORZILLERI   | *      |                        |
|                      | *      |                        |
| v.                   | *      | Civil No. JFM-15-3760  |
|                      | *      |                        |
| MARILYN MOSBY        | *      |                        |

******

### MEMORANDUM

Plaintiff Keri L. Borzilleri brings suit against defendant Marilyn Mosby seeking damages for violations of the First Amendment pursuant to 42 U.S.C. § 1983, the Maryland Declaration of Rights, and Maryland tort law, relating to Mosby's termination of Borzilleri.  Now pending is Mosby's motion to dismiss Borzilleri's amended complaint.  The parties have fully briefed the motion, and no oral argument is necessary.  *See* Local Rule 105.6.  For the reasons below, I dismiss Counts I–III of Borzilleri's amended complaint with prejudice and dismiss Counts IV–V without prejudice.

### BACKGROUND

This dispute arises out of Baltimore City State's Attorney Marilyn Mosby's dismissal of Keri Borzilleri, an Assistant State's Attorney ("ASA"), shortly after Mosby assumed her post. Before her termination, Borzilleri had worked as an ASA in the Baltimore City State's Attorney's Office ("Baltimore City SAO") for over nine years.[1]  (ECF No. 14, ¶ 1).  Borzilleri had served as a line prosecutor for two prior Baltimore City State's Attorneys—Patricia Jessamy and Gregg Bernstein—and was, in her own words, a "career prosecutor" in the office.  (*Id.* at ¶¶ 5, 11).  Before her termination, Borzilleri had also worked as one of the office's three

---

[1] Because this case is at the motion to dismiss stage, the facts are as stated in Borzilleri's complaint.

1

"Community Prosecutors," who "prosecuted complex crimes and served as a liaison between the State's Attorney's Office, the community, and the local police."  (*Id.* at ¶ 5).

In June 2013, Mosby (who had formerly worked as an ASA under Bernstein, but who had since left for private practice) announced she would challenge Bernstein in the 2014 Democratic Party Primary for Baltimore City State's Attorney.  (*Id.* at ¶ 12).  According to Borzilleri, the primary "developed into a fiercely contested race and witnessed several tense exchanges between the proponents of Mr. Bernstein and Ms. Mosby."  *Id.*  Borzilleri supported her boss Bernstein.  (*Id.* at ¶ 14).  Borzilleri had no official role in Bernstein's campaign and never donated money to him; she did, however, host a "meet and greet" event for Bernstein at her house, which Bernstein and approximately twenty other people attended.  *Id.*  Borzilleri publicized the event by sending electronic leaflets touting Bernstein's record, and at the event she gave a speech supporting Bernstein's re-election bid, touting his term as State's Attorney and stating that he had helped improve Baltimore.  *Id.*  After the event, the Bernstein campaign posted pictures of the event on its Facebook page.[2]  *Id.*  Borzilleri expressed her support for Bernstein's candidacy in other ways as well, including by speaking to prospective voters at another of his campaign events and by placing a Bernstein reelection sign in front of her house.  (*Id.* at ¶¶ 16–17).

Prior to the campaign, Borzilleri describes her relationship with Mosby as "always cordial and respectful."  (*Id.* at ¶ 10).  But after Borzilleri began campaigning for Bernstein, their relationship soured.  For instance, Borzilleri alleges that on two occasions, when she accompanied Bernstein in her official capacity at community meetings that Mosby also attended, Mosby "glared directly" at her and "did not acknowledge or otherwise greet her."  (*Id.* at ¶ 18).

---

[2] Borzilleri claims that Mosby found out about her support for Bernstein from Facebook.  (*Id.* at ¶ 15).

Mosby defeated Bernstein in the June 2014 Democratic primary and went on to win the general election for Baltimore City State's Attorney in November of the same year. (*Id.* at ¶ 19). She was sworn in as State's Attorney on January 5, 2015. (*Id.* at ¶ 22). The day after Mosby's swearing-in, a newly minted Mosby political appointee, Joshua Rosenblatt, asked Borzilleri if she would be interested in joining a small unit within the Baltimore City SAO that "would collect and manage intelligence." (*Id.* at ¶ 23). Borzilleri expressed interest. Two days later, Rosenblatt again approached Borzilleri and told her he had received information that a recruit for his new unit had campaigned for Bernstein. He asked Borzilleri to describe her connection with the Bernstein campaign "so that he could figure out 'how to fix the problem' before it became 'an issue.'" (*Id.* at ¶ 24). Borzilleri did not deny her support for Bernstein and admitted to holding a Bernstein campaign event at her house. The next day, another Mosby appointee named Steward Beckham emailed Borzilleri directing her to meet with him. (*Id.* at ¶ 26). On Borzilleri's way to the meeting, she bumped into Rosenblatt, who could only "confirm[] that the meeting related to their conversation the day before about her support for Mr. Bernstein's campaign." *Id.* At the meeting, Beckham fired Borzilleri but "gave no details or reasons as to why she was being fired." *Id.* As Borzilleri was collecting her belongings, Beckham delivered a letter, signed by Mosby, stating that she was being terminated without cause, effective immediately. (*Id.* at ¶ 27).

Shortly after her termination, Borzilleri contacted the City of Baltimore to determine her eligibility for a deferred vested pension. (*Id.* at ¶ 51). Plaintiff was eligible for such a pension only if she could show that she was "laid off due to no fault of her own." (*Id.* at ¶ 52). She was told by the City of Baltimore, however, that her termination letter, in which Mosby stated she was being terminated without cause, was insufficient documentation of a layoff. When

Borzilleri wrote the Baltimore City SAO for further documentation, Beckham wrote that her position had not been eliminated and thus, the City of Baltimore determined she was not eligible for the pension.  (*Id.* at ¶¶ 54–55).  It was only later, after Borzilleri sent the State of Maryland a demand letter setting out substantially the same claims as in the current lawsuit, that the City of Baltimore sent her a letter indicating that she was, contrary to their earlier determination, eligible for the pension.  This letter appears to indicate that the City of Baltimore re-characterized her termination as a layoff, (*see id.* at ¶ 59), and Borzilleri alleges that on information and belief, Mosby and/or other State employees instructed the City of Baltimore to reclassify Borzilleri's termination as such upon receiving her demand letter.

Borzilleri alleges that she was one of several State's Attorney's employees fired for their support of Bernstein.  (*See id.* at ¶¶ 30–36).  In total, Borzilleri alleges Mosby fired six veteran prosecutors for political reasons and at least thirty prosecutors left in part because of those firings.  (*Id.* at ¶ 43).  Borzilleri now sues Mosby for violations of her First Amendment rights pursuant to 42 U.S.C. § 1983 (Counts I and II), violations of her Article 40 rights under the Maryland Declaration of Rights (Counts III and IV), and for abusive discharge (Count V).

## STANDARD

When ruling on a motion to dismiss, a court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).  A court, however, cannot afford the same deference to legal conclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss, a complaint, relying on only well-pled factual allegations, must state at least a "plausible claim for relief."  *Id.* at 678.  The "mere recital of elements of a cause of action, supported only by conclusory statements, is not

4

sufficient to survive a motion made pursuant to Rule 12(b)(6)."  *Walters v. McMahen*, 684 F.3d

435, 439 (4th Cir. 2012).  To determine whether a complaint has crossed "the line from

conceivable to plausible," a court must employ a "context-specific inquiry," drawing on the

court's "experience and common sense."  *Iqbal*, 556 U.S. at 680.

## ANALYSIS

### I.    First Amendment and Article 40 Patronage Dismissal Claims (Counts I and III)

Mosby seeks to dismiss Counts I and III of Borzilleri's complaint alleging that she

terminated Borzilleri in violation of her First Amendment and Article 40 rights against patronage

dismissal.  Mosby attacks these claims on three fronts.  First, she argues that Borzilleri fails to

state a claim on both counts.  Second, regarding the First Amendment claim, she argues that she

is entitled to qualified immunity because she did not violate "clearly established law."  *Pearson*

*v. Callahan*, 555 U.S. 223, 243 (2009).  Lastly, regarding the Article 40 patronage claim, Mosby

claims entitlement to statutory immunity pursuant to the Maryland Torts Claims Act ("MTCA").

#### a.  Plausibility of Borzilleri's Patronage Claims

I first consider whether Borzilleri has stated plausible Article 40 and First Amendment

patronage dismissal claims.  Mosby argues that Borzilleri fails to state a political patronage claim

because Borzilleri is a policymaker or alter ego to Mosby, as described by controlling case law,

who is exempt from the prohibition on patronage dismissals.  I agree.

The First Amendment provides that, "Congress shall make no law . . . abridging the

freedom of speech," and Article 40 provides that "every citizen of the State ought to be allowed

to speak, write and publish his sentiments on all subjects."  Article 40 is "'co-extensive' with the

First Amendment, and is construed in pari materia with it."  *Kensington Volunteer Fire Dep't,*

*Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 468 n.3 (4th Cir. 2012).

The First Amendment protection against patronage dismissals, established by the Supreme Court in *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980), prohibits government employers, including elected officials, from firing "nonpolicymaking, nonconfidential government employee[s] . . . upon the sole ground of [their] political beliefs." *Elrod*, 427 U.S. at 375 (Stewart, J., concurring). A "narrow exception" to the prohibition on patronage dismissals, however, arises when a government employee occupies a "policymaking position[]." *Bland v. Roberts*, 730 F.3d 368, 374 (4th Cir. 2013), *as amended* (Sept. 23, 2013). In analyzing whether an employee occupies such a position, the dispositive question is not whether the employee meets a formulaic definition of a policymaker, but rather whether "[p]olitical affiliation is an appropriate [job] requirement"—that is, whether "there is a rational connection between shared ideology and job performance." *Stott v. Haworth*, 916 F.2d 134, 142 (4th Cir. 1990) (internal quotation marks omitted),

The Fourth Circuit has adopted a two-step test to determine whether a government employee fits within the *Elrod/Branti* exception. First, a court considers whether "the position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Stott v. Haworth*, 916 F.2d 134, 141 (4th Cir. 1990). If the answer to the first question is in the affirmative, a court then examines "the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political affiliation] is an equally appropriate requirement." *Id.; see also Fields v. Prater*, 566 F.3d 381, 386 (4th Cir. 2009) (using political affiliation and party affiliation interchangeably). The first step of the *Stott* test requires a court "to examine the issues dealt with by the employee 'at a very high level of generality,' while '[t]he second step requires a much

more concrete analysis of the specific position at issue.'" *Bland*, 730 F.3d at 375 (internal citations omitted).

Here, plaintiff's position as a line prosecutor satisfies the first step of the *Stotts* analysis. The Fourth Circuit's *en banc* decision in *Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1997)— upholding a North Carolina sheriff's politically motivated dismissal of deputy sheriffs for failing to support him in an election—is particularly instructive.  There, the court determined that plaintiffs qualified for the first part of the *Stotts* test both because of the importance of the sheriff's position and because of the significant role of the deputy sheriffs in carrying out the sheriff's policy agenda.  The court explained that "the electorate vests in the sheriff broad discretion to set and implement the policies necessary to carry out his goals" and "[d]eputy sheriffs play a special role in implementing the sheriff's policies and goals . . . [by] exercising significant discretion in performing their jobs . . . [and because, i]n the course of their duties, deputies will make some decisions that actually create policy."  *Id.* at 1162 (internal citations and quotation marks omitted).

Although the *Jenkins* court's holding applied to "North Carolina deputy sheriffs," *id.* at 1164, much of the court's reasoning applies here as well.  Like the elected sheriff in that case, Maryland State's Attorneys are also elected and given discretion to implement their policy agendas; and like the deputy sheriffs in *Jenkins*, ASAs are also crucial to the efficacy of the office of their boss and play a "special role" in shaping their agenda.  Indeed, given the discretion afforded to line prosecutors, one could easily conclude that ASAs play a greater role in setting a State's Attorney's agenda than do deputy sheriffs in setting an elected sheriff's agenda. As former Attorney General and Supreme Court Justice Robert Jackson once noted, "[t]he prosecutor has more control over life, liberty and reputation than any other person in America."

Robert H. Jackson, *The Federal Prosecutor*, 24 J. AM. JUDICATURE SOC. 18 (1940).  ASAs

are given a tremendous amount of discretion over their duties—they choose which cases to

investigate, which to charge, which to plead out, and which to bring to trial.  And by their nature,

prosecutorial decisions often involve issues where there is space for political disagreement.  *Cf.*

*Bland*, 730 F.3d at 376 (finding that sheriff's deputies met the first step of the *Stott* test because

"[c]ertainly there is legitimate disagreement over the goals and implementation of the goals of a

sheriff's office"); *see also Livas v. Petka*, 711 F.2d 798, 801 (7th Cir. 1983) ("[A]n Assistant

State's Attorney may, in carrying out his or her duties, make some decisions that will actually

create policy . . . . The public interest in the efficient administration of justice requires that

decisions made by such assistant prosecutors conform with the broad objectives chosen by the

prosecutor.")

      Furthermore, Borzilleri's exercise of prosecutorial discretion as a line prosecutor would

have had a direct impact on Mosby's performance as State's Attorney.  Even routine decisions,

such as which crimes to charge or what plea deal to offer, would reflect on the performance of

the entire SAO and would carry with them potential political consequences.  One improvident

choice or misstep—like a poorly thought-out trial strategy—could seriously affect the public's

perception of Mosby's performance and hinder her ability to implement her agenda.  Thus, like

the deputy sheriffs in *Jenkins,* Borzilleri's exercise of prosecutorial discretion invariably

included "decisions that actually create policy." *Jenkins*, 119 F.3d at 1162, and, as a result,

Borzilleri's position fulfilled the first step of the *Stott* test.

      The second step of the *Stott* test is also met.  In *Jenkins*, the Fourth Circuit determined—

based on its study of North Carolina statutes and case law—that North Carolina deputy sheriffs

met the requirements of the second step of the *Stott* test because they were "alter egos" to and

"acted in the name of and with powers coterminous" to the elected sheriff.  119 F.3d at 1163–64.

Maryland law, as well as Borzilleri's own description of her position, show that, similarly to the

deputy sheriffs in *Jenkins*, Borzilleri was an alter ego of the State's Attorney such that political

affiliation was an appropriate requirement for her position.  Indeed, again, *Jenkins's* reasoning

applies with even more force to the case at bar—in *Jenkins*, the court found that the deputy

sheriffs were policymakers even though the sheriff could "not delegate final responsibility for his

official duties" to them.  119 F.3d at 1163.  Here, by contrast, a State's Attorney is entitled to

delegate full and final responsibility for prosecutions to ASAs.  In Maryland, a State's Attorney

is defined as "a person authorized to prosecute an offense."  Md. Rule 4-102.  And Maryland

courts have consistently found that ASAs are among those persons authorized to stand in and

prosecute an offense on behalf of the State's Attorney, *i.e.*, act as complete alter egos to the

State's Attorney.  *See, e.g.*, *State v. Aquilla*, 309 A.2d 44, 48 (Md. 1973) (holding that because a

State's Attorney "generally may assign to his deputies and assistants the performance, subject to

his discretion and control, of the duties required of him by law with respect to the institution and

prosecution of criminal action," ASAs "have the same legal powers as the State's Attorney to

represent the State before grand juries"); *In re Anderson*, 315 A.2d 540, 550 n. 24 (Md. App.

1974) ("The attorney for the State may be construed to include Assistant State's Attorneys and

Deputy State's Attorneys as well as the State's Attorney"), *aff'd*, 321 A.2d 516 (1974); *State v.

Brown*, 24 A.3d 195, 198 (Md. App. 2011) (holding that an ASA was a "person authorized by

law" to sign a charging document).

In addition to Maryland case law describing how ASAs act as alter egos to their State's

Attorneys, Borzilleri pleads facts showing the same.  She acknowledges that on behalf of the

State's Attorney, she made decisions such as whether to charge citizens with crimes and whether

to extend plea offers. (*See* ECF No. 14, ¶¶ 6, 8). She underscores the importance of her duties by describing how, as a line prosecutor, she was "responsible for prosecuting some of Baltimore's most violent and serious crimes" on behalf of the Baltimore City SAO. (*Id.* at ¶ 5). Moreover, perhaps more importantly to the *Stotts* analysis, Borzilleri admits she was one of the SAO's three Community Prosecutors, a role in which she represented the State's Attorney to the public and fellow law enforcement officials. As Borzilleri recognizes, not only were Community Prosecutors tasked with prosecuting "complex crimes," but they were also required to communicate to the public on behalf of the SAO: Borzilleri describes in her complaint how she often attended community events "to communicate with Baltimore residents about the concerns and needs of their community." (*Id.* at ¶¶ 5, 18). In Borzilleri's words, being a Community Prosecutor involved serving "as a liaison between the State's Attorney's Office, the community, and the local police."[3] (*Id.* at ¶ 5). Because Borzilleri—if she had continued in this role—would have been "involved in communicating [Mosby's] policies or positions to the public," *Knight v. Vernon*, 214 F.3d 544, 550 (4th Cir. 2000), and would have had at least some degree of discretion in doing so, "loyalty to [Mosby was] an appropriate requirement for the job." *Jenkins*, 119 F.3d at 1164.

Finally, Borzilleri has failed to distinguish her position in any meaningful sense from the wide range of cases holding that prosecutors fall within the *Elrod/Branti* exception. *See, e.g.*, *Aucoin v. Haney*, 306 F.3d 268 (5th Cir. 2002). In *Aucoin*, the Fifth Circuit held that a plaintiff assistant district attorney's position fell within the *Elrod/Branti* exception because he "had great

---

[3] While, when analyzing Borzilleri's position under *Stott*, I am directed to "focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office," 916 F.2d 134 at 142, Borzilleri appears to concede that the powers inherent in the office of the Community Prosecutor included "represent[ing] the State's Attorney's Office" and "answer[ing] questions on criminal law from the public." (ECF No. 17, p. 28).

discretion" in handling his docket; he exercised "judgment and discretion on a daily basis, without much contact with the district attorney;" and he was "a visible representative of the district attorney's office." *Id.* at 726. The court also found significant the fact that a number of its sister circuits had determined that government attorneys qualified for the *Elrod/Branti* exception. *Id.* at 275; *see also Gordon v. Cty. of Rockland*, 110 F.3d 886 (2d Cir. 1997) (involving assistant county attorneys); *Fazio v. City & County of San Francisco*, 125 F.3d 1328 (9th Cir. 1997) (involving an assistant district attorney); *Monks v. Marlinga*, 923 F.2d 423 (6th Cir. 1991) (involving assistant prosecuting attorneys); *Livas v. Petka*, 711 F.2d 798 (7th Cir.1983) (involving an ASA); *Mummau v. Ranck*, 687 F.2d 9 (3d Cir. 1982) (involving an assistant district attorney); *Vanterpool v. Cuccinelli*, 998 F. Supp. 2d 451 (E.D. Va. 2014) (involving an assistant attorney general); Susan Lorde Martin, *A Decade of Branti Decisions: A Government Official's Guide to Patronage Dismissals*, 39 AM. U. L. REV. 11, 46–47 (1989) ("All circuit court decisions—and almost all other court decisions—involving attorneys in government service, other than public defenders, have held that *Elrod/Branti* do not protect these positions"). The result is no different here: Borzilleri exercised a significant degree of discretion in handling cases on behalf of the Baltimore City SAO, was a visible representative of the SAO, and her work required her to act in the name of the State's Attorney.

For these reasons, I find, as a matter of law, that Borzilleri occupied a position for which political affiliation was an appropriate requirement. Accordingly, Mosby, as a newly elected official, was within her rights to terminate Borzilleri to ensure decisive and faithful implementation of her policies, and I dismiss Counts I and III of plaintiff's amended complaint.

  *b.  Federal Qualified Immunity*

Even if Borzilleri had stated a First Amendment claim, which I conclude she has not, Mosby would be entitled to qualified immunity on Count I.[4]

The doctrine of qualified immunity shields public officials—including state prosecutors, *see Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994)—"from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted). An official is shielded from liability when she shows either that her conduct did not violate a constitutional right or that the right at issue was not "clearly established in the specific context of the case." *Merch. v. Bauer*, 677 F.3d 656, 662 (4th Cir. 2012). For a rule to be "clearly established," existing appellate precedent must have "placed the statutory or constitutional question beyond debate" so that it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alterations omitted). Here, assuming that Mosby fired Borzilleri for political reasons and that Borzilleri has stated a plausible political patronage claim, the dispositive question for the qualified immunity analysis would thus be whether Mosby's firing of Borzilleri violated clearly established constitutional law. It did not.

Borzilleri argues that at the time of her termination, "it was clearly established that the First Amendment protects career government employees from being fired during a political transition by a State official merely because of their support for the incoming State official's political rivals." (ECF No. 14, ¶ 65). But Borzilleri overstates the breadth of the *Elrod*/*Branti* line of cases and does not articulate the right Mosby allegedly violated "at a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).

---

[4] The qualified immunity analysis applies only to Count I because, under Maryland law, federal qualified immunity is not a defense for state constitutional torts.

Borzilleri fails to point to any case law, binding or even persuasive, showing that line prosecutors, or "closely analogous" government employees, *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002), enjoyed a clearly established constitutional right against patronage dismissals at the time of her dismissal.  Indeed, as discussed in part *supra*, the caselaw existing at the time of Borzilleri's termination weakens, rather than strengthens, her position.  For instance, in *Clark v. Brown*, 861 F.2d 66 (4th Cir. 1988), the Fourth Circuit considered a nearly identical question to the one presented here.  There, a former assistant county district attorney asserted First Amendment violations arising out of his politically motivated termination at the hands of his boss, the county district attorney.  The court, citing *Branti*, and cases from the Third and Seventh Circuits holding that assistant prosecutors fit within the *Elrod/Branti* exception, upheld a district court's finding of qualified immunity because "[a]t the very least, [existing caselaw] establish[ed] that dismissal of an assistant prosecutor for political reasons was not clearly prohibited."  *Id.* at 68.  Plaintiff, who relies almost exclusively on *Elrod* and *Branti* for her qualified immunity argument—both cases that were decided pre-*Clark*—fails to show that the state of the law has changed since *Clark*.  On this ground alone, Mosby is entitled to qualified immunity on plaintiff's federal patronage claim.

Furthermore, *Branti* itself shows the unsettled state of the law relating to politically motivated terminations of prosecutors.  Although the *Branti* Court held that an assistant public defender did not fit within the *Elrod/Branti* exception, it also noted that its holding did not necessarily apply to prosecutors like Borzilleri: "This is in contrast to the broader public responsibilities of an official such as a prosecutor. We express no opinion as to whether the deputy of such an official could be dismissed on the grounds of political party affiliation or loyalty."  445 U.S. at 519 n.13 (citing a case upholding the dismissal of a deputy city attorney).

Therefore, for Borzilleri, the existing case law at worst precludes her federal political patronage claim and at best leaves the law unsettled in the circumstances presented here.  Either outcome leads to only one conclusion: that no clearly established right prohibiting the politically motivated firings of prosecutors exists.  Because the weight of case law shows that prosecutors did not have a clearly established right against politically motivated terminations at the time of Borzilleri's dismissal, Mosby is entitled to qualified immunity on Borzilleri's First Amendment patronage claim.  Therefore, Count I is also dismissed on this basis.

## II.    First Amendment Retaliation Claim (Count II)

Mosby also seeks dismissal of Count II, which alleges that Mosby unlawfully terminated Borzilleri in retaliation for exercising her First Amendment free speech rights.  Mosby argues first that Borzilleri fails to state a claim; and second, that she is entitled to qualified immunity on her First Amendment claim because she did not violate "clearly established law."

### a.  Plausibility of Borzilleri's First Amendment Retaliation Claim

The parties initially dispute which standard to apply to Borzilleri's First Amendment retaliation claim.  Typically, courts begin their analysis of free speech retaliation claims with two Supreme Court cases: *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968).  *See Jenkins v. Medford*, 119 F.3d 1156, 1160 n.20 (4th Cir. 1997).  The analysis involves three steps—initially, a court asks whether the plaintiff employee spoke as a citizen on a matter of "public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  If so, the court must balance "the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  Lastly, "if the employee's claim satisfies both of these legal criteria,

the court turns to the factual question of whether the employee's speech was a substantial factor in the employee's termination decision." *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013) (internal quotation marks omitted).

The second step of the *Pickering* analysis—*Pickering* balancing—changes, however, when political affiliation is an appropriate requirement for a government employee's position, thus implicating the *Elrod/Branti* line of cases. That is, where political affiliation is a proper requirement for a government employee and the alleged speech relates to that political affiliation, as here, the *Pickering* balance tips decisively in favor of the government. As the Fourth Circuit has explained, the *Pickering* analysis in such cases tends "to merge with the established jurisprudence governing the discharge of public employees because of their political beliefs and affiliation." *Bland*, 730 F.3d at 374. And for a position to "which the *Elrod–Branti* exception applies, and an employer therefore does not violate his employee's association rights by terminating him for political disloyalty, the employer also does not violate his employee's free speech rights by terminating him for speech displaying that political disloyalty." *Id.* at 394 (citing *Jenkins*, 119 F.3d at 1164); *see also Rose v. Stephens*, 291 F.3d 917, 923 (6th Cir. 2002) ("[W]hen an employee occupies a position for which political loyalty is a legitimate criterion, the nature of the position itself weights the balance in favor of the government."); *Fazio v. City & Cty. of San Francisco*, 125 F.3d 1328, 1332 (9th Cir. 1997) (same); *cf. Embry v. City of Calumet City, Ill.*, 701 F.3d 231, 235 (7th Cir. 2012) (holding that "*Elrod–Branti* applies when the public speech is nothing more than public political affiliation"); *Wilbur v. Mahan*, 3 F.3d 214, 218 (7th Cir. 1993) (holding that a government employer can dismiss a policymaking employee for their political free speech); *Vanterpool v. Cuccinelli*, 998 F. Supp. 2d 451, 461 (E.D. Va. 2014)

(concluding that "whether the *Elrod–Branti* exception applie[d]" to a plaintiff's position was conclusive of both the plaintiff's political patronage and free speech retaliation claims).

In this case, taking Borzilleri's allegations as true, her alleged speech constituted political disloyalty towards Mosby for which Mosby could dismiss Borzilleri.  Borzilleri's political support of Bernstein, Mosby's opponent, included hosting a campaign event for him; giving a speech supporting him at that campaign event; distributing electronic leaflets to publicize the event; speaking to prospective voters at another Bernstein campaign event; and placing a Bernstein campaign sign on her front lawn.  Accordingly, because I have previously concluded that the *Elrod/Branti* exception applies to Borzilleri's position, the *Pickering* scale tips decisively in favor of Mosby on Borzilleri's retaliation claim and I dismiss Count II of the amended complaint.

### b. *Federal Qualified Immunity*

Alternatively, even if, under Fourth Circuit precedent, an employer could *not* terminate an employee for politically disloyal speech where the *Elrod/Branti* exception applies, Mosby would still be entitled to qualified immunity on the First Amendment retaliation claim.  Other circuits have noted, in contrast to *Bland*, that the "policymaking status of the discharged or demoted employee is very significant in the *Pickering* balance, but not *conclusive*."  *McEvoy v. Spencer*, 124 F.3d 92, 103 (2nd Cir. 1997) (emphasis added).  In *McEvoy*, the Second Circuit upheld dismissal of plaintiff's complaint on Rule 12(b)(6) grounds, but also noted that, in the alternative, defendants were entitled to qualified immunity since it was objectively reasonable for them to believe that plaintiff's position fell within the *Elrod/Branti* exception and that the law was unsettled as to whether plaintiff's policymaking status controlled the disposition of his free speech retaliation claim.  *See id.* at 104–105.  Similarly, in *Leslie v. Hancock Cty. Bd. of Educ.*,

720 F.3d 1338 (11th Cir. 2013), the Eleventh Circuit upheld a district court's finding that

defendants were entitled to qualified immunity because "[n]o clearly established law bars the

termination of a policymaking or confidential employee for speaking about policy." *Id.* at 1349.

So too here.  As discussed above, a large volume of case law holds that prosecutors fit within the

*Elrod/Branti* exception, and Mosby was therefore reasonable in believing that Borzilleri's

position was one where political affiliation was an appropriate requirement.  Furthermore, as

*Bland* shows, it was at minimum, an open question as to whether Borzilleri's policymaking

status controlled the disposition of her retaliation claim.  For these reasons, Mosby is also

entitled to qualified immunity on Count II.

## III.    Remaining State Law Claims (Counts IV and V)

In light of my dismissal of the first three claims asserted by Borzilleri, the only remaining

claims are her state law claims (Counts IV and V).  A district court has discretion to dismiss a

case where, as here, it "has dismissed all claims over which it has original jurisdiction."  28

U.S.C. § 1367(c)(3).  The supplemental jurisdiction doctrine is one of "flexibility," and

therefore, a court's exercise of discretion under § 1367(c)(3) is afforded "wide latitude."

*Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (internal quotation marks omitted).  The

four factors a court considers in deciding whether to exercise supplemental jurisdiction are:

"convenience and fairness to the parties, the existence of any underlying issues of federal policy,

comity, and considerations of judicial economy."  *Id.*   "When the balance of these factors

indicates that a case properly belongs in state court, as when the federal-law claims have dropped

out of the lawsuit in its early stages and only state-law claims remain, the federal court should

decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon*

*Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Here, after considering the aforementioned factors, I decline to exercise supplemental jurisdiction over Borzilleri's remaining state law claims and dismiss them without prejudice. Borzilleri's state claims—an Article 40 retaliation claim and an abusive discharge claim— involve interpretations of the Maryland Declaration of Rights and Maryland tort law respectively, which are best reserved for Maryland state courts.[5] Moreover, because both Borzilleri and Mosby are Maryland residents, declining to exercise jurisdiction would be neither unfair nor inconvenient to the parties. And lastly, in view of the early stage of litigation, Mosby and Borzilleri would not be burdened by a change in jurisdiction.[6]

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiff's amended complaint is granted. Counts I–III of plaintiffs' amended complaint are dismissed with prejudice and Counts IV–V are dismissed without prejudice. A separate order follows.

---

[5] Because I believe that the controlling state law governing Borzilleri's Article 40 retaliation claim (Count IV) diverges from the federal law governing her First Amendment retaliation claim (Count II), I do not find that Borzilleri has failed to state a claim on Count IV. While, as noted above, Article 40 and the First Amendment are read *in pari materia*, there are cases in which Maryland state courts read Maryland constitutional provisions and their federal counterparts differently. *See Pack Shack, Inc. v. Howard Cty.*, 832 A.2d 170, 176 n.3 (Md. 2003). The intersection of the *Elrod/Branti* line of cases and free speech retaliation claims appears to be one such instance. In contrast to *Bland*, the Maryland Court of Appeals has held that where political speech, and not just political affiliation, is at issue, a determination that the *Elrod/Branti* policymaking exception applies does not control the outcome of a plaintiff's free speech retaliation claim. *See Newell v. Runnels*, 967 A.2d 729, 746–761 (Md. 2009) (holding that even if plaintiffs "were policymakers, we nonetheless are unable to conclude, as a matter of law, that the *Elrod/Branti* test would shield them from liability"); *O'Leary v. Shipley*, 545 A.2d 17, 20–25 (Md. 1988). Accordingly, this case appears to be the rare instance in which the applicable law is different for the First Amendment and Article 40 claims, and thus, I do not dismiss Count IV on 12(b)(6) grounds.

[6] If Borzilleri chooses, she may file her claim in a state court "within thirty days of the entry of this court's order of dismissal without it being time-barred." *Farmer v. Kavanagh*, 494 F. Supp. 2d 345, 371 n.51 (D. Md. 2007) (citing Md. Rule 2–101(b)(2)).

May 31, 2016
Date

\_\_\_/s/_____
J. Frederick Motz
United States District Judge